**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 15-cv-62323-JAL**

**SECURITIES AND EXCHANGE COMMISSION,**

       **Plaintiff,**

**v.**

**EB5 ASSET MANAGER, LLC,**
**and LIN ZHONG A/K/A LILY ZHONG,**

       **Defendants, and**

**U.S. EB-5 INVESTMENTS LLC,**
**OAKLAND OFFICE HOLDINGS LLC,**
**B.X WOK CONSTRUCTION LLC,**
**US INVESTMENT LLC d/b/a US INVESTMENT FL LLC,**
**TOP SUN ENERGY LLC,**
**OCEAN BLVD. FAMILY LIMITED PARTNERSHIP, LTD.,**
**B.X PROPERTY MANAGEMENT LLC,**
**US1 REAL ESTATE DEVELOPMENTS, LLC,**
**and INVESTOR ASSET PROTECTION LLC,**

       **Relief Defendants.**

_____/

```
FILED by _____ D.C.

   NOV 0 4 2015

  STEVEN M. LARIMORE
  CLERK U.S. DIST. CT.
  S. D. of FLA. – MIAMI
```

**SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN**
**SUPPORT OF ITS EMERGENCY MOTION FOR**
**ASSET FREEZE AND OTHER RELIEF**

## I. INTRODUCTION

Since at least March 2011, Defendants Lin Zhong, a/k/a Lily Zhong, and EB5 Asset

Manager, LLC ("Asset Manager") have exploited for their own benefit a federal visa program to

defraud investors seeking investment returns and a path to United States residency. To date,

Defendants have fraudulently raised at least $8.5 million through their sales of securities to at

least 17 investors. To date, Defendants Zhong and Asset Manager have misappropriated or

misused approximately $900,000 of EB-5 Investments funds. And they continue to have

unfettered access to the accounts they misused for their own benefit and to the detriment of investors.

Accordingly, the Commission requests an Order freezing Defendants' and Relief Defendants' assets, requiring sworn accountings, repatriating funds Defendants sent overseas, prohibiting destruction of documents, and expediting discovery.    A proposed Order encompassing all of the requested relief is attached.

## II.  OVERVIEW OF THE FRAUD AND NEED FOR EMERGENCY RELIEF

Beginning in or about March 2011 until at least August 2015, Defendants have raised at least $8.5 million from approximately 17 investors by offering and selling securities in the form of membership shares in U.S. EB-5 Investments, LLC ("EB-5 Investments"). EB-5 Investments purportedly generate profits from the development of real property in Florida.

Most of the victims of this fraud are foreign nationals seeking residency in the United States. Defendants solicited the investments predominantly from Chinese citizens, claiming the investments would qualify under the EB-5 Program administered by United States Citizenship and Immigration Services ("USCIS"), while doing little to ensure that investor funds were invested in a manner consistent with the EB-5 program. The EB-5 Program provides that foreign nationals may qualify for United States residency if they make qualified investments of $500,000 or more in a specified project that is determined to have created or preserved at least 10 jobs for United States workers.

Using the EB-5 Program as a lure, and the promise of investment returns, Defendants targeted Chinese investors in a scheme to sell securities to finance real estate projects, including the residential development of homes in Palm Bay, Florida and the commercial development of City Center in downtown Port St. Lucie, Florida.

2

However, rather than use the money solely for the projects for which it was purportedly raised, Defendants Zhong and Asset Manager improperly diverted approximately $900,000 of EB-5 Investment funds in undisclosed and improper transactions.  Zhong misappropriated these funds by transferring them to Relief Defendant US Investment LLC d/b/a US Investment FL LLC ("USI"), a subsidiary of EB-5 Investments in which she secretly holds an ownership interest, Relief Defendant B.X Wok Construction LLC ("B.X Wok"), and her personal bank account.  From there, Zhong transferred EB-5 Investments funds to purchase the $2.5 million oceanfront home where she currently resides on a part-time basis, a 48-foot boat, and luxury cars, as well as to pay her daughter's educational expenses, fund her brokerage account, and support her other companies.

Defendants' misrepresentations and omissions in the EB-5 Investments offering documents are equally troubling.  Defendants misrepresented how they would use EB-5 Investments funds, the financial reports they would provide investors, the safety of the investment, and even the location of the projects EB-5 Investments was funding.  While touting the investment and Zhong's role in it, Defendants concealed Zhong's history of bankruptcy and failed business dealings and her conflicts of interest.

On August 26, 2015 - after learning of the Commission's investigation in this matter - Defendants assigned some of EB-5 Investments' assets to a newly formed entity, Relief Defendant Investor Asset Protection, presumably for the purpose of disbursing to investors "any proceeds from the sale of [EB-5 Investments] property consistent with the terms of the governing… [Private Placement Memoranda]." While the assignment of these interests certainly acknowledges the Commission's concern that Defendants cannot be trusted to continue to control investor assets, the assignment does not actually protect investors.  To begin with,

3

Investor Asset Protection is not impartial.  Zhong selected EB-5 Investments' accountant, whom she still employs, as Investor Asset Protection's sole member.  Moreover, Zhong continues to maintain exclusive control over Defendants' and Relief Defendants' bank accounts – the same accounts she exploited for her personal benefit for years – as well as some of EB-5 Investments' real property, despite the assignment to Investor Asset Protection.

On September 14, 2015, Defendants issued an amendment to the EB-5 Investments' Private Placement Memoranda, asking investors to recommit to the investment or settle with Defendants.  The amendment notified existing investors for the first time that EB-5 Investments would "likely be unsuccessful" in obtaining an EB-5 visa for investors and no longer pursue pending visa petitions.  Thus, after years of soliciting investors by offering EB-5 Investments as a path to prosperity and residency in the United States, EB-5 Investments revealed itself as nothing more than a path for Zhong to line her pockets with investor money.

Unless Defendants' assets are frozen, investors will be no more likely to recover their losses than obtain their now abandoned EB-5 visas.

### III. FACTS

### A. Defendants

1.  Asset Manager is a Florida limited liability company Zhong formed in 2010 and located in Oakland Park, Florida.[1]  Zhong is the managing member of Asset Manager, and Asset Manager is the managing member of Relief Defendant EB-5 Investments.[2]

---

[1]Ex. 1 (Fla. Dept. of State Record for Asset Manager).

[2]Id. See also Ex. 2 (Zhong Testimony Transcript 1) at 189:22-25; Ex. 3 (Fla. Dept. of State Record for EB-5 Investments).

2. <u>Zhong,</u> age 49, is a citizen of New Zealand.[3]  During the scheme described herein, Zhong resided part-time in the United States and split her time between Boca Raton and Highland Beach, Florida.[4]  Zhong has the following relationships to the relevant entities:

| Entity (status in this action) | Description |
|---|---|
| Asset Manager (Defendant) | Managing Member[5] |
| EB-5 Investments (Relief Defendants) | Managing Member of Asset Manager, the Managing Member of EB-5 Investments[6] |
| B.X Wok (Relief Defendant) | Managing Member[7] |
| B.X Property Management LLC ("B.X Property") (Relief Defendant) | Managing Member[8] |
| USI (Relief Defendant) | Managing Member[9] |
| Ocean BLVD. Property Management, LLC ("Ocean LLC") (not a party) | Manager[10] |
| Ocean BLVD. Family Limited Partnership, Ltd. ("Ocean LP") (Relief Defendant) | Manager of Ocean LLC, the general partner of Ocean LP[11] |
| Top Sun Energy LLC ("Top Sun") (Relief Defendant) | Manager[12] |
| Oakland Office Holdings LLC ("Oakland Holdings") (Relief Defendant) | Manager[13] |
| US1 Real Estate Developments, LLC ("US1 Real Estate") (Relief Defendant) | Manager[14] |

[3]Ex. 4 (Testimony Ex. 7, Background Questionnaire Answers) at Item 4; Ex. 2 at 31:6-32:6; Ex. 49 (Testimony Ex. 2, Background Questionnaire Questions) at Item 4; Ex. 2 at 10:20-11:7 (authenticating Testimony Ex. 2).

[4]Ex. 2 at 33:22-34:9.

[5]Ex. 1; Ex. 2 at 189:22-25.

[6]*Id. See also* Ex. 2 (Zhong Testimony Transcript 1) at 189:22-25; Ex. 3 (Fla. Dept. of State Record for EB-5 Investments).

[7]Ex. 5 (Fla. Dept. of State Record for B.X Wok).

[8]Ex. 6 (Fla. Dept. of State Record for B.X Property).

[9]Ex. 7 (Fla. Dept. of State Record for USI); Ex. 8 (Del. Secretary of State Record for USI); Ex. 9 (Testimony Ex. 11); Ex. 2 at 142:15-143:4.

[10]Ex. 10 (Fla. Dept. of State Record for Ocean LLC).

[11]Ex. 11 (Fla. Dept. of State Record for Ocean Partnership).

[12]Ex. 12 (Fla. Dept. of State Record for Top Sun).

[13]Ex. 13 (Fla. Dept. of State Record for Oakland Holdings).

[14]Ex. 14 (Fla. Dept. of State Record for US1 Real Estate).

Zhong also co-owns three entities that have obtained designation as a "Regional Center" from USCIS,[15] which designation authorizes these entities to sponsor EB-5 Program investment offerings.[16]  In about 2008, the High Court in Auckland, New Zealand declared bankrupt Winsun Developments Limited ("Winsun"), a New Zealand real estate development company of which Zhong was a director.[17]  Zhong was also the subject of bankruptcy proceedings in New Zealand prior to commencing the EB-5 Investments offering.[18]  Zhong controls the bank accounts for each of the entities through which investor money flowed, including Relief Defendant EB-5 Investments[19] and, as set forth below, all Relief Defendants that have bank accounts.

## B.  **Relief Defendants**

1.  EB-5 Investments is a Florida limited liability company Zhong formed in 2010 and located in Oakland Park, Florida.[20]  Defendant Asset Manager is the managing member of EB-5 Investments.[21]

2.  Oakland Holdings is a Florida limited liability company located in Oakland Park, Florida and formed in 2012.[22]  Zhong has been Oakland Holdings' manager since its inception.[23] Zhong is a signatory on the Oakland Holdings bank accounts.[24]

---

[15]Ex. 15 (Karen Mentor Investigative Testimony Transcript) at 82:9-83:23; Ex. 4.

[16]Ex. 47 (USCIS Certification for US EB5 Florida Regional Center LLC).

[17]Ex. 2 at 310:4-23; Ex. 16 (Springer-Charles Declaration) at page 5, ¶ 7.

[18]Ex. 17 (Certified records of the Court in New Zealand).

[19]Ex. 18 (Certified signatory page for EB-5 Investments Account).  Defendant Asset Manager does not maintain a bank account.

[20]Ex. 3.

[21]See, supra, n. 3.

[22]Ex. 13 (Fla. Dept. of State record for Oakland Holding.

[23]Ex. 13.

[24]Ex. 19 (Certified signature page for Oakland Holdings account).

3.  <u>B.X Wok</u> is a Florida limited liability company located in Oakland Park, Florida.[25] Zhong formed B.X Wok, a construction company, in 2011, and has been its managing member since then.[26]  B.X Wok is a wholly-owned subsidiary of EB-5 Investments.[27]  Zhong is a signatory on the B.X Wok bank accounts and controls the company.[28]

Relief Defendant B.X Wok was funded through 2014 solely through EB-5 Investments funds, either directly from EB-5 Investments or through USI's accounts.[29]  In 2015, EB-5 Investments has continued funding B.X. Wok, to the tune of $451,800.[30]

4.  <u>USI</u> is a Delaware limited liability company located in Oakland Park, Florida.[31]  USI was formed in 2008[32] and invests in real estate in the United States,[33] and Zhong has been USI's managing member since its inception.[34]  From 2008 until present, Zhong has owned 1 percent of USI, and from 2008 until June 15, 2012, Zhong's family members owned the remaining 99 percent of USI.[35]  On June 15, 2012, Zhong caused EB-5 Investments to purchase her family

---

[25]Ex. 5 (Fla. Dept. of State record for B.X Wok).

[26]*Id.* Ex. 2 at 283:9-10.

[27]Ex. 2 at 210:17-23; Ex. 20 (Testimony Ex. 23) at pp. 7, 10, 47, 48; Ex. 21 (Testimony Ex. 26) at p.4; Ex. 22  (Testimony Ex. 27) at p.3; Ex. 23 (Testimony Ex. 28); Ex. 24 (Testimony Ex. 29) at pp. 3, 6; Ex. 15 at 183:9-15(authenticating Ex. 22, Test. Ex. 27).

[28]Ex. 25 (Certified signatory page for B.X Wok); Ex. 2 at 214:24-215:8; Ex. 35 (Zhong Testimony Transcript 2) at 774:19-775:14.

[29]*Id.* at ¶ 20.

[30]*Id.* at ¶ 21.

[31]Ex. 8 (USI State Department record).

[32]*Id.*

[33]Ex. 2 at 154:19-155:5.

[34]Ex. 8.

[35]Ex. 26 (testimony Ex. 10); Ex. 2 at 136:6-14 (authenticating Ex. 26 hereto); Ex. 2 at 136:6-141:7.

members' ownership interests in USI, making USI a subsidiary of EB-5 Investments.[36]  Zhong is

the signatory on the USI bank accounts.[37]

From November 23, 2011 until February 6, 2012, Zhong transferred $65,000 from EB-5

Investments' accounts to Relief Defendant USI,[38] which, as discussed above, was wholly-owned

by Zhong and her family members until June 14, 2012.  After USI became a subsidiary of EB-5

Investments on June 15, 2012, Zhong transferred $4,022,509 from EB-5 Investments Accounts

to USI Accounts,[39] and approximately $416,233 from B.X Wok Accounts to USI.[40]

From November 23, 2011 until December 31, 2014, USI was funded largely through

these deposits, receiving only about $84,164 from sources other than EB-5 Investments, B.X

Wok, and Zhong.[41]

5.  <u>Top Sun</u> is an inactive Florida limited liability company located in Oakland Park,

Florida.[42]  Zhong formed Top Sun in December 2011[43] as a start-up solar energy business.[44]

From December 1, 2011 until December 2011, Zhong was the managing member of Top Sun

---

[36]*Id.*

[37]Ex. 27 (certified signatory page for USI).

[38]*Id.* at ¶ 11.

[39]*Id.* at ¶ 12.

[40]*Id.* at ¶ 16.

[41]*Id.* at ¶ 17.

[42]Ex. 12 (Florida Secretary of State records for Top Sun).

[43]*Id.*

[44]Ex. 2 at 502:18-24; Ex. 28 (Testimony Ex. 48).

and operated it.[45]  Zhong was a manager of Top Sun until at least May 1, 2013.[46]  Zhong is a signatory on the Top Sun bank accounts.[47]

6.  Ocean LP is an inactive limited partnership located in Oakland Park, Florida.[48]  The general partner of Ocean LP is Ocean LLC, an inactive Florida limited liability company formed in 2011.[49]  Zhong and EB-5 Investments have an ownership interest in Ocean LP,[50] and Zhong is the manager of Ocean LLC, which is the general partner of Ocean LP.[51]

7.  B.X Property is an Oakland Park, Florida limited liability company Zhong formed in 2011 to engage in real estate and property management service.[52]  Zhong is the managing member of B.X Property.[53]  Zhong is a signatory on the B.X Property bank accounts.[54]

8.  US1 Real Estate is an Oakland Park, Florida limited liability company Zhong formed in 2014, and Zhong is the manager of US1 Real Estate.[55]  US1 Real Estate is a wholly-owned subsidiary of EB-5 Investments.[56]

9.  Investor Asset Protection LLC is a Delaware limited liability company Zhong's counsel formed on August 25, 2015.[57]  The sole member of Investor Asset Protection is John

[45]Exs. 12 & 28; Ex. 29 (Testimony Ex. 35); Ex. 2 at 504:23-24.

[46]Ex. 12.

[47]Ex. 31 (certified signatory page for Top Sun).

[48]Ex. 11 (Fla. Dept. of State records for Ocean LP).

[49]Ex. 10 (Fla. Dept. of State records for Ocean LLC).

[50]Ex. 2 at 425:8-17.

[51] Exs. 10 & 11.

[52]Ex. 6 (Florida Secretary of State Records for B.X Property)

[53]Id.

[54] Ex. 97 (certified signatory page for B.X Property).

[55]Ex. 14 (Florida Secretary of State records for US1 Real Estate).

[56]Ex. 2 at 594:16-595:18.

Heller, whom Zhong retained to serve as manager of Investor Asset Protection[58] and whose firm

Zhong previously hired as the accountant for EB-5 Investments.[59]

### C. Related Individual

Karen Mentor, 56 years of age, resides in Hobe Sound, Florida.[60]   Mentor is a licensed

Florida and New Jersey attorney and a licensed Florida real estate broker.[61]   Mentor was the

attorney associated with EB-5 Investments' investor immigration petitions to the USCIS.[62]

### D. THE FRAUDULENT SCHEME

### 1. EB-5 Investments' Corporate Structure

Defendant Zhong sits atop and controls several companies which have been instrumental

to her fraudulent scheme.   Zhong is the managing member of Defendant Asset Manager, which

is the managing member of Relief Defendant EB-5 Investments.[63]   Zhong, through Asset

Manager, holds the majority of membership interests in EB-5 Investments,[64] and has total control

of EB-5 Investments.[65]  As the managing member of Asset Manager, Zhong has control of all

aspects of EB-5 Investments,[66] controls EB-5 Investments' bank accounts,[67] and has made all

---

[57]Ex. 45 (Delaware Secretary of State Record, Investor Asset Protection)

[58]Ex. 16 at Schedule 1 to the Operating Agreement attached to the Third Amendment to the PPM; Ex. 35 at 727:23-28; Ex. 50 (Testimony Exhibit 100).

[59]Ex. 35 at 701:2-13.

[60]Ex. 48 (Testimony Ex. 45) (authenticated at Ex. 15 at 20:13-21:16).

[61]Ex. 48; Ex. 15 at 21:17-22:5.

[62]Ex. 2 at 86:21-24; Ex. 15 at 150:13-151:10, 161:25-162:15; Ex. 52 (Retainer Agreements between Mentor and EB-5 Investments Investors, Testimony Ex. 50).

[63]Ex. 3 (Fla. Dept. of State Record for EB-5 Investments); Ex. 2 at 189:22-25.

[64]Ex. 20 at p.9; Ex. 53 (EB-5 Investments PPM) at p.8; Ex. 39 at p.8.

[65]Id.

[66]Ex. 2 at 189:22-25; Ex. 86 (2nd PPM, Testimony Ex. 93) at p.5, ¶q; Ex. 51 (Investor Yiyi Zhu Testimony) at 79:23-80:21.

management decisions for EB-5 Investments.[68]   As set forth above in Section III.B, Relief

Defendants B.X Wok, USI, and US1 Realty are EB-5 Investments' subsidiaries.  Zhong is the

managing member of B.X Wok and USI with exclusive control over these entities' bank

accounts,[69] the manager of Relief Defendant Oakland Holdings with control of its bank accounts,

controls Relief Defendant Top Sun's bank accounts, and is the manager of US1 Realty and

Relief Defendants Ocean LP and B.X Property.  She controls them all.

## 2. EB-5 Investments' Business

EB-5 Investments was purportedly in the business of providing funds to support the

development of residential and commercial property meeting the requirements of the USCIS EB-

5 Program.[70]  Under the program, a foreign national can receive conditional and then permanent

residency status by making a $500,000 investment in a "Targeted Employment Area" ("TEA")

that creates at least ten full-time jobs for United States workers.

## 3. The EB-5 Investments Securities Offering

Defendants solicited investments in membership interests in EB-5 Investments for

$500,000,[71] plus an administrative fee typically ranging from $55,000 to $76,500 per investor.[72]

Beginning in or about March 2011 until at least August 2014, Defendants raised approximately

---

[67]Ex. 18; Ex. 35 at 666:22-25, 730:11-14.

[68]Ex. 2 at 189:22-25; Ex. 86 (EB-5 Operating Agreement, Testimony Ex. 69) at p.5, ¶q.; Ex. 51 (Investor Yiyi Zhu Testimony) at 79:23-80:21) (authenticating Ex. 48, Testimony Ex. 69).

[69]Ex. 2 at 107:14-19, 210:17-23.

[70]Ex. 40 (Testimony Ex. 25), at pp. 7, 8, 10; 48; Ex. 39 (Testimony Ex. 24), at pp. 5, 7, 8-9, 47; Ex. 40 at pp. 5-6, 7, 9, 48; Ex. 23 at p. 4; Ex. 22 at p.3; Ex. 23 at p.1; Ex. 41 (Testimony Ex. 39) at p.3; Ex. 24 at p.3.

[71]Ex. 39 at p.6.

[72] Ex. 2  at 71:23-72-9.

$8.5 million from 17 individuals[73] as investments in real estate development projects in Florida.[74] EB-5 Investments also raised $1.2 million in administrative fees from investors.[75]

The EB-5 Investments membership interests are securities. To begin with, EB-5 Investments' offering materials identify them as such.[76] Moreover, each investment in EB-5 Investments involved an investment of money in a common enterprise with profits to come from the efforts of others. Defendants pooled investor funds in EB-5 Investments' and its subsidiaries bank account.[77] According to EB-5 Investments' offering materials, EB-5 Investments would invest these investor funds in companies to engage in real estate development projects and to provide returns the investors would share.[78]

The investors' fortunes were also linked with those of the investment's promoters, namely Defendants, in generating profits. Investors had no control over EB-5 Investments' operations. Instead, the generation of profits depended on Defendants' management and real estate development efforts.[79] Investors had the right to vote at annual meetings of EB-5 Investments,[80] but Defendants divested investors of any input they might have had on the operations of EB-5 Investments by not holding annual meetings.[81]

---

[73]Ex. 2 at 217:7-11.

[74]Ex. 39 at p.6.

[75]Ex. 30 (Declaration of Margaret Vizzi), at ¶ 5, n.5.

[76]Ex. 39 at p. 25 ("Securities Being Offered").

[77]Ex. 30 at ¶ 7.

[78]Ex. 39 at p.5; Ex. 54 (Third PPM) at p.5; Ex. 53 at SEC-NX-EB5-ZhongL-E-000000623-00054.

[79]Ex. 53 at SEC-NX-EB5-ZhongL-E-000000623-00060-61.

[80]*Id.* at SEC-NX-EB5-ZhongL-E-000000623-00063, Section 6.2.

[81]Ex. 2 at 458:20-459:5.

Further, even with a vote, Asset Manager always held the majority of all outstanding membership interests, giving it, and Zhong through her control of Asset Manager, complete control over EB-5 Investments.[82]

### 4. The Offering Materials

Defendants solicited investors through offering materials, including an EB-5 Investments PPM, operating agreement, subscription agreement, and, in some instances, and an escrow agreement ("Offering Materials").  Investors, through attorney Karen Mentor, submitted the Offering Materials and a business plan to USCIS in support of investors' EB-5 visa petitions.[83]

Zhong and Asset Manager had ultimate authority over the statements contained in EB-5 Investments' Offering Materials by virtue of their control over Investments LLC.

### a. *PPMs*

Defendants distributed an EB-5 Investments PPM to investors.  As set forth below, EB-5 Investments has at least four versions of the PPM.  Zhong participated in the creation and drafting of each PPM and approved each for distribution to investors.[84]

### i. *First and Second PPM*

Defendants utilized the first PPM, dated March 1, 2011 ("First PPM"), during 2011, 2012, and 2013.[85]  The First PPM promised investors that investor funds would be deposited into an escrow account until the USCIS approved their EB-5 visa petitions.[86]  Defendants utilized a second PPM (different copies of which had minor differences in the amount of the administrative

---

[82]*See supra* n. 66.

[83]Exs. 55 and 56 (visa applications).

[84]Ex. 2 at 336:15-348:15.

[85]Ex. 2 at 347:4-10.

[86]Ex. 20 (First PPM, Testimony Ex. 23) at pp 5-6.

fee), also dated March 1, 2011 ("Second PPM"),[87] during 2011[88] and 2012.[89] The Second PPM is substantially similar to the First PPM, including the same representations about holding investor funds in an escrow account.[90]

EB-5 Investments stated in the First PPM and Second PPM that it was "a holding company using investors' funds to provide financing in the form of equity capital to [Relief Defendant] B.X Wok … for use in developing real estate construction projects, either owned by B.X Wok … or on another entity's behalf."[91] The First and Second PPMs also stated that "100% of the proceeds of [the] offering [would] be provided as equity capital to B.X Wok … for use in its development projects."[92] These PPMs also stated that administrative fees would be provided to Asset Manager "for use in paying set up costs, operating costs, and other administrative fees associated with [the] offering"[93]

### ii. Third PPM

The Defendants distributed the Third PPM, also dated March 1, 2011 ("Third PPM"), from about June 2013[94] until at least July 2014.[95] Unlike the Second PPM, the Third PPM,[96] does not contain representations about placing investor funds in escrow.[97]

---

[87]Ex. 53; Ex. 15 at 662:5-663:19.

[88]Id. at 43; Ex. 57 (Mentor Declaration; authenticating Ex. 58); Ex. 58 (PPM executed October 2012) at p 43.

[89]Ex. 57 (Mentor Declaration; authenticating Ex. 58); Ex. 58 (PPM executed October 2012) at p 43.

[90]Ex. 53.

[91]Exs. 20 at p.10; Ex. 53 at pp. 8-9.

[92]Id.

[93]Ex. 20 at pp. 7,8, 10, 48; Ex. 53 at pp. 5,7,8-9, 47.

[94]Ex. 2 at 344:21-23; 347:4-10.

[95]Ex. 54 (Third PPM, executed July 2014) at p. 81; Ex. 57 (authenticating Ex. 59).

[96] Id.

And while the Second PPM represented that investor proceeds would be used as equity capital for B.X Wok to use in developing real estate construction projects, the Third PPM stated EB-5 Investments would use "investors' funds to do projects in the form of equity capital to various companies, whether in existence or to be formed in the future, for use in various projects associated with the developing of the City Center Project."[98]   City Center was described as a mixed-used commercial real estate project in Port St. Lucie, Florida.[99]   The Third PPM also stated that "100% of the proceeds of [the] offering [would] be provided as equity capital to various companies for use in projects, or to such other entities as the Manager may, [in] its sole and unfettered discretion, designate."[100]   The PPM also stated that Asset Manager would use administrative fees for set up costs, operating costs, and other administrative fees associated with the offering.[101]

### iii.  Fourth and Fifth PPMs

A Fourth and Fifth PPM are dated June 1, 2013 ("Fourth PPM").[102]   Defendants sent the Fourth and Fifth PPMs to investors,[103] who executed Acknowledgements of Acceptance.[104]   The Fourth PPM promises the same use of investor funds as the Third PPM and states EB-5

---

[97] Exs. 53 & 54.

[98] Ex. 54 at 8 (Use of Proceeds).

[99] Ex. 23 at p. 1.

[100] Id. at 9 (Use of Proceeds, cont'd).

[101] Id. at 5 (Purposes of Company).

[102] Ex. 40; Ex. 66 (Investigative Test. Exh. 3).

[103] Ex. 51 at Ex. 60 (PPM sent to Zhu, Testimony Ex. 68);   Ex. 66 at ¶10;   Ex. 64 at 73:8-74:12; Investigative Test. Ex. 82).

[104] Ex. 61 (Testimony Ex. 30); Ex. 2 at 358:14-359:14.

Investments will develop a residential project in Brevard County, Florida.[105]  The Fifth PPM is identical to the Third PPM, with the exception of the date.[106]

### b. *Operating Agreement*

Defendants attached to each PPM an operating agreement,[107] the majority of which Zhong executed on behalf of Asset Manager.[108]  The operating agreement states:

> [EB-5 Investments] may enter into arrangements, contracts, or agreements which benefit the members, their family, or affiliates with the consent of the other members provided that the consent of the other members shall not be unreasonably withheld if there has been full disclosure by said members as to the benefits to be received by him or his family or affiliates, and the arrangement, contract, or agreement is no less favorable than similar arrangements, contracts, or agreements that are available to the company on an arm's length basis.[109]

### c. *Subscription Agreement*

Defendants distributed a subscription agreement to investors.[110]  Zhong signed the majority of the subscription agreements on behalf of Asset Manager and EB-5 Investments.[111]

The EB-5 Investments subscription agreement states investors' "funds shall be used only for purposes set forth in the [PPM]...."[112]  Investors' investments in EB-5 Investments were finalized in the United States.  Specifically, the majority of investment funds were received at Bank of America in the United States via wire transfer (in most cases), or by check.[113]

---

[105]Ex. 40 at 6 (Purposes of Company).

[106] Ex. 66 at Ex. 3.

[107]Ex. 20 at SEC-Mentor-K-E-0003248; Ex. 2 at 320:11-14, 619:5-11.

[108]Ex. 20 at SEC-Mentor-K-E-0003279.

[109]Ex. 20 at SEC-Mentor-K-E-0003252, Section 1.8.

[110]Ex. 2 at 320:11-14; Ex. 20 at SEC-Mentor-K-E-0003284.

[111] Ex. 43 (Subscription Agreements).

[112]Ex. 20 at SEC-Mentor-K-E-0003287, Paragraph 11.

[113]Ex. 30 at ¶ 5 footnote 2.

#### d. *Escrow Agreement*

Defendants also distributed an escrow agreement to the majority of investors,[114] which Zhong reviewed and approved.[115]   The escrow agreements assured investors their contributions would remain in an escrow account until USCIS approved their EB-5 visa petitions.[116]   Zhong signed the escrow agreements on behalf of EB-5 Investments.[117]

#### e. *Business Plan*

EB-5 Investments had a business plan, which investors submitted through Mentor to USCIS with their EB-5 visa petitions.[118]   The business plan described Zhong as having more than twenty years of experience as an entrepreneur, including real estate development, and discussed Zhong's role as the developer for the Winsun project.[119]   Zhong approved the business plans before they were distributed.[120]

#### f. *Zhong's Distribution of the Offering Materials*

Zhong distributed the Offering Materials to investors, including during in-person meetings with investors.  For example, in the first half of 2011, Zhong met investor Yiyi Zhu in Shanghai, China.[121]   Zhong told Zhu she could obtain a green card by investing in EB-5 Investments,[122] which would use Zhu's funds to develop a house for Zhu in Palm Bay, Florida.[123]

---

[114]Ex. 62 (Zhan Escrow Agreement, Testimony Ex. 80); Ex. 63 (Escrow Agreements, Testimony Ex. 32); Ex. 2 at 229:16-230:7, 368:15-17; Ex. 64 (Investor Zhan Testimony) at 66:21-67:4.

[115]Ex. 2 at 369:7-9.

[116]Ex. 32 (Palm Beach County Property Appraiser Records); Ex. 2 at 369:11-16.

[117]Ex. 32; Ex. 20 at SEC-Mentor-K-E-0003288.

[118]Exs. 21-24 & 41; Ex. 2 at 637:15-638:7.

[119]Ex. 21 at p.17; Ex. 22 at p.22; Ex. 41 at p.20; Ex. 24 at p.30.

[120]Ex. 2 at 350:24-351:14, 356:12-357:13, 637:15-638:7.

[121]Ex. 51 at 24:5-27:6, 34:20-25.

[122]*Id.* at 35:8-15.

Zhong provided Zhu with the Offering Materials, including the First PPM, subscription agreement, and operating agreement.[124]  On July 23, 2011, Zhong met Zhu in Shanghai, where they executed the investment documents.[125]  Zhu invested $500,000.[126]

In September 2012, Zhong met Hequn Zhang in Florida.[127]  Zhong told Zhang the investment in EB-5 Investments was a real estate project, she would build and sell homes, and Zhang would receive a return on his investment from the proceeds of the home sales.[128]  Zhong told Zhang the minimum investment was $500,000, plus a fee of $55,000.[129]  Zhong provided Zhang the First PPM, together with the operating agreement and subscription agreement.[130]  Zhang and Zhong met in Florida a second time, where they executed these agreements and an escrow agreement.[131]  Zhang made his $500,000 via wire transfer to EB-5 Investments.[132]  In 2013, after USCIS denied Zhang's EB-5 visa petition, Zhong sent Zhang the Third PPM.[133]

In or about 2011, Zhong solicited investor Baisheng Xu to invest in EB-5 Investments.[134]  Zhong met Xu in Orlando, Florida, told Xu she would use his $500,000 investment to develop homes in Florida, and Xu would receive a Green Card and a home as a return on his

---

[123]*Id.* at 35:8-37:20.

[124]*Id.* at 27:14-29:16; Ex. 65 (Testimony Ex. 65).

[125]Ex. 51 at 27:14-29:9; Ex. 65 at SEC-MentorK-E-0000690.

[126]Ex. 51 at 54:11-13.

[127]Ex. 66 (Declaration of Investor Hequn Zhang) at ¶ 3.

[128]*Id.*

[129]*Id.* at ¶ 5.

[130]*Id.* at ¶ 7and Ex. 1 thereto.

[131]*Id.* at ¶¶ 7 & 8.

[132]*Id.* at ¶ 24 and Ex. 9 thereto.

[133]*Id.* at ¶ 10 and Ex. 3 thereto.

[134]Ex. 67 (Investor Xu Declaration) at ¶ 5.

investment.[135]  Zhong told Xu all he need do was provide information for the EB-5 visa petition, funds for the investment, and documentation of the funds' source.[136]  Xu invested $500,000.[137]

In summer 2013, Zhong met with investor XiHao Wang in Beijing, China.[138]  Zhong told Wang EB-5 Investments would invest in real estate and the minimum investment was $500,000.[139]  In July 2013, Zhong met Wang a second time in Beijing and told him that EB-5 Investments would use Wang's investment funds to build a home.[140]  During this second meeting, Zhong provided Wang with the offering materials and Wang executed them.[141]  Wang invested in EB-5 Investments and he remains an investor as of September 14, 2015.[142]

### 5.  Defendants' Misuse and Misappropriation of Funds

From no later than November 2011 until at least October 2014, Zhong and Asset Manager misused or misappropriated approximately $900,000 from EB-5 Investments.[143]  Zhong, who was the sole signatory on the EB-5 Investments accounts,[144] transferred EB-5 Investments funds to fund her personal expenditures and companies she owned.  Zhong misappropriated EB-5 Investments' funds both directly from EB-5 Investments' accounts and by transferring funds to her personal bank account and EB-5 Investments' subsidiaries, Relief

---

[135]*Id.* at ¶¶ 6 & 7.

[136]*Id.* at ¶¶ 10 & 11.

[137]Ex. 20 at SEC-MentorK-E-0003282, 0003284-88; Ex. 67; Ex. 2 at 445:22-446:1.

[138]Ex. 68 (Testimony of Investor Xihao Wang) at 30:23-31:1.

[139]*Id.* at 30:22-31:23, 51:1-18.

[140]*Id.* at 34:9-36:9.

[141]*Id.* at 33:22-35:12; Ex. 69 (Wang Offering Materials, Testimony Ex. 89); Ex. 68 at 37:21-38:8, 41:2-43:19.

[142]Ex. 16 at p.25 (list of Investing Members).

[143]Ex. 30 at ¶ 23 (identifying approximately $746,000 as misappropriated funds), and ¶ 17, n. 11 (identifying an additional 149,000 as misdirected funds).

[144]Ex. 18.

Defendants B.X Wok and USI.  Zhong then caused EB-5 Investments and its subsidiaries to enter into several transactions—none disclosed to investors—that were inconsistent with the Offering Materials and that, in many cases, benefitted her personally at EB-5 Investments' expense.  The following provisions are at issue:

- Management Fee

Pursuant to all versions of the PPM, Zhong and Asset Manager could only receive funds in the form of a management fee.[145]  The Offering Documents disclosed two ways Zhong and Asset Manager could receive a fee, but neither occurred during the period of the fraudulent scheme.

First, if EB-5 Investments realized profits or interest on the funds invested in any given year, Asset Manager was entitled to collect 3.5% of the amount of money under management as of January 1 the following year, with excess profits to be distributed pro-rata to Asset Manager and each investor.[146]  However, EB-5 Investments did not even generate revenue from the sale of real property from which to calculate a potential profit until at least 2014.[147]  The Offering Documents also made clear that the Management Fee was to be paid "only from profits or interest on moneys invested and not from any immigrant investor's paid-in capital."[148]  Thus, Asset Manager was not entitled to collect a Management Fee until January 1, 2015, when profits for calendar year 2014 could be calculated.  Zhong admitted as much during her sworn

---

[145] Ex. 20 at pp. 10, 37-38, 56; Ex. 54 at 10, 37-38, 56; Ex. 40 at 9-10, 37-38, 56.

[146] *Id.* at p. 10; Ex. 2 at 280: 12-18.

[147] Ex. 2 at 625:25-626:14.

[148] Ex. 20 at pp. 10.

testimony, explaining that the money she took for personal expenditures was a loan, not a Management Fee.[149]

If profits or interest were insufficient to pay any portion of the Management Fee (as was the case here), the Offering Documents alternatively provided that investors could "be required to pay a separate administrative fee,"[150] presumably to prevent the use of investor's paid-in capital for the payment of a Management Fee.  But Zhong made clear during sworn testimony that the investor deposits she took to pay personal expenditures were not a management fee.[152]

- Use of Proceeds Limited to Construction Projects

The First PPM and the Second PPM describe EB-5 Investments as financing "real estate construction projects."[153]  The Third PPM recites even more specifically that EB5-Investments will be using investor funds "for use in various projects associated with the developing of the City Center Project," a mixed-use commercial project planned for Port St. Lucie, Florida.[154]  All three PPMs promise that "100% of the proceeds of the offering" will be used for the projects identified in the PPMs.[155]  Likewise, the subscription agreement states that an investor's "funds shall be used only for purposes set forth in the [PPM] in connection with the subscriber's application to immigrate . . . ."[156]

---

[149] Ex. 2 at 280:2-11.

[150]*See supra* n. 145.

[152]Ex. 2 at 280:2-11.

[153]Ex. 20 (First PPM, Testimony Ex. 23) at p. 9; Ex. 53 (Testimony Ex. 93), at pp. 8-9.

[154] Ex. 54 (Third PPM, executed July 2014) at pp. 46-47; Ex. 57 (authenticating Ex. 54).

[155] Ex. 20 (First PPM, Testimony Ex. 23) at p. 9; Ex. 53 (Testimony Ex. 93) at pp. 8-9; Ex. 59 (Third PPM, executed July 2014) at pp. 46-47.

[156] Ex. 59 (Investor Documents), at p. 4, ¶ 11.

- Duty of Loyalty/Investor Approval of Related Party Transactions

EB-5 Investments' Operating Agreement contemplates that Zhong and her other affiliated entities could do business with EB-5 Investments but with two significant limitations on this power:

      1.    A Member (including Asset Manager, the managing member controlled by Zhong) "shall not take any action that would be reasonably deemed to be harmful to or contrary to the interests of the Company or the purposes stated herein."[157]

      2.    Any of EB-5 Investments' "arrangements, contract [sic], or agreements which benefit the Members, their Family or Affiliates" require consent of the other members.[158]

The following transactions were in violation of one or more of these provisions, and Zhong never disclosed to investors that she was engaging in them.

### a. *Transactions that Benefitted Zhong at EB-5 Investments' Expense*

The transactions described below all involve the use of EB-5 Investments' funds in a manner that benefitted Zhong or an entity she controlled, contrary to the representations to investors that EB-5 Investments' funds would be used to pursue the construction projects, that Zhong would not act in a manner contrary to EB-5 Investments' interests, and that any arrangements or agreements that benefitted the family or affiliate of a member would require investor approval.

---

[157]Ex. 59 (Investor Documents), at p. 10, ¶ 1.5.

[158]*Id.* at p. 11, ¶ 1.7.  This section provides that the other members cannot unreasonably withhold their consent, but this limitation applies only (a) when the member seeking consent has disclosed the benefits the member will receive, and (b) the agreement benefiting the member is just as favorable to EB-5 Investments as an arms-length transaction. *See id.*

### i.   Zhong's Retention of Proceeds from Sales of Corporate Owned Real Estate

As of June 2012, USI was 99% owned by Zhong's mother, father, and brother, with Zhong owing 1%.[159]  In June 2012, two agreements purportedly resulted in (a) EB-5 Investments obtaining for a nominal amount the Zhong family's 99% interest in USI, but with (b) Zhong purportedly reserving the right to 50% of USI's profits notwithstanding her ownership of only 1% of USI's membership interests.[160]

At various times thereafter, USI, which was financed predominately by EB-5 Investments or its B.X Wok subsidiary,[161] purchased eleven real estate properties, which it sold in two batches in February and May 2014.[162]  When USI sold the real estate, Zhong claimed an

---

[159]Ex. 26 (USI Purchase Agreement, Testimony Ex. 10), at p. 1, ¶ 1.

[160]*Id.* at p. 1, ¶¶ 2-3; Ex. 80 (Profit Distribution Agreement, Testimony Ex. 12); Ex. 2 (Zhong Testimony) at 135:17-136:18, 138:15-136:18, 148:9-149:7.  We say "purportedly" because the profit distribution agreement is signed by Zhong's family members as members of USI but is dated three days *after* the purchase agreement, which divested them of their membership interests.  No one signed the Profit Distribution Agreement on behalf of EB-5 Investments, although it is clear from Zhong's testimony that she is treating the Profit Distribution Agreement as being effective.

[161]Ex. 30 (Vizzi Dec.) ¶¶ 11-19.  Zhong confirmed in testimony that the properties were bought with EB-5 Investments' funds. Ex. 2 (Zhong Testimony) 103:3-109:18.

[162]

There are eleven properties at issue, all of which USI acquired after it became a subsidiary of EB-5 Investments (i.e., at a time EB-5 Investments could have bought the properties in its own name and avoided the obligation to pay half the profits to Zhong).  The county records show the following:

| Property | USI Acquisition | USI Sale |
|---|---|---|
| 2108 Alwar Avenue SW Palm Bay, Florida | Nov. 5, 2012 (Ex. 103) | Feb. 28, 2014 (Ex. 104) |
| 2545 Hagoplan Avenue SW Palm Bay, Florida | Oct. 30, 2012 (Ex. 105) | Feb. 28, 2014 (Ex. 106) |
| 2555 Hagoplan Avenue SW Palm Bay, Florida | Oct. 30, 2012 (Ex. 105) | Feb. 28, 2014 (Ex. 107) |
| 579 Fountain Street SW Palm Bay, Florida | Apr. 19, 2013 (Ex. 108) | Feb. 28, 2014 (Ex. 109) |
| 1990 Day Avenue SW Palm Bay, Florida | Apr. 19, 2013 (Ex. 108) | Feb. 28, 2014 (Ex. 110) |
| 874 Wiseman Street Palm Bay, Florida | Apr. 19, 2013 (Ex. 108) | May 19, 2014 (Ex. 111) |

*footnote continued*

entitlement to 50% of the profits, and she kept for herself approximately $149,000,[163] profits she was only able to obtain as a result of the arrangement she engineered between EB-5 Investments and USI.

### ii.   Oakland Holdings Condominium Purchase and Lease

As of July 2012, Zhong and Mentor were the sole members of Oakland Holdings.[164]  In August 2012, Oakland Holdings purchased for $139,000, plus closing costs, an office condominium located 1620 West Oakland Park Boulevard, No. 400, Oakland Park, Florida.[165] Oakland Holdings paid just under $41,000 in cash and the seller took back a secured mortgage note of $100,000, which required monthly payments of $599.55 for five years, at which time a balloon payment was due for the balance.[166]  Zhong and Mentor split the cash contribution,[167]

| | | |
|---|---|---|
| 526 Forrest Hills Street<br>Palm Bay, Florida | Apr. 19, 2013 (Ex. 108) | May 20, 2014 (Ex. 112) |
| 3010 Pomello Avenue<br>Palm Bay, Florida | Apr. 19, 2013 (Ex. 108) | May 20, 2014 (Ex. 113) |
| 2551 SE Westmoreland Boulevard<br>South Port Saint Lucie, Florida | Jan. 16, 2014 (Ex. 114) | May 19, 2014 (Ex. 73) |
| 1474 SW Parr Drive<br>Port Saint Lucie, Florida | Jan. 21, 2014 (Ex. 115) | May 20, 2014 (Ex. 71) |
| 1938 Conway Road—Unit 5<br>Orlando, Florida | Dec. 17, 2013 (Ex. 70, at 1-2) | May 20, 2014 (Ex. 70, at 3-4) |

(Some of the properties listed above are identified in the deeds only by lot and block number.  With respect to those, the appraisal records link the deeds to particular addresses. *See* Ex. 102 (Brevard County appraiser records); Ex. 72, 74 (Saint Lucie County appraiser records).

[163]Zhong estimated at $200,000 the amount she would be entitled to, but claimed she kept only $70,000. Ex. 2 (Zhong Testimony) 103:3-110:17, 192:7-12; Ex. 80 (Profit Distribution Agreement, Testimony Ex. 12).  However, the bank records show a net benefit to her of at least $149,000. *See* Ex. 30 (Vizzi Dec.) ¶¶ 10, 17, n. 11.

[164]Ex. 15 (Mentor Testimony) 321:15-322:5; Ex. 87 (Mentor statement, testimony exhibit 60).

[165]Ex. 88 (Broward County appraiser records); Ex. 89 (Broward County property records), at 3-4; Ex. 98 (settlement statement) at 20-25.

[166]Ex. 89 (Broward County property records), at 11; Ex. 98 (settlement statement) at 20-25.

[167]Ex. 98 (Mentor email to Zhong, 8/15/2012), at 13.

and Zhong caused EB-5 Investments to pay Zhong's portion of $20,365.[168]  Contemporaneously

with the closing of the real estate transaction, Zhong caused EB-5 Investments to lease from

Oakland Holdings the office space (which EB-5 Investments rarely uses[169]) for 10 years at $599

per month, approximately the same amount of the required mortgage payment of $599.55.[170]  In

addition to the rent,[171] between February 2013 and December 2014, EB-5 Investments paid

$39,582 to the condo association for the office space.[172]  Thus, as a result of these undisclosed

transactions undertaken without investor consent, EB-5 Investments, (a) paid over $20,000

towards Oakland Holdings' acquisition of the office condominium, (b) entered into a lease

agreement that enabled Oakland Holdings to satisfy its obligations under the mortgage note, and

(c) covered some or all of Oakland Holdings' condominium expenses.

### iii.   Purchase of Properties for Zhong

In November 2012, Zhong used $76,547 of USI funds to purchase for herself individually

the property located at 1151 North Platte Lane, Poinciana, Florida.[173]  In September 2014, Zhong

used $79,849 of USI funds to purchase for herself individually the property located at 105

Rodney Street, Worcester, Massachusetts.[174]

---

[168]Ex. 30 (Vizzi Dec.) ¶ 28.

[169]Ex. 2 (Zhong Testimony) at 212:20-213:22, 437:22-438:2; Ex. 15 (Mentor Testimony) at 308:11-310:17.

[170]Ex. 81 (Commercial Lease Agreement, Testimony Ex. 37); Ex. 2 (Zhong Testimony) at 511:6-512:16.

[171] Ex. 30 (Vizzi Dec.) at ¶ 41.

[172] *Id.* at ¶ 43; Ex. 89 (Broward County property records), at 5.

[173] *Id.* (Vizzi Dec.) ¶ 29a; Ex. 92 (Warranty Deed of 1151 North Platte Lane, 11/28/2012); Ex. 20 (Polk County Property Record Card, Sales Information, Item 2).  On March 5, 2015—after the SEC had issued subpoenas to Zhong and EB5 Investments—Zhong deeded this property over to EB-5 Investments.  *See* Ex. 91 (quit claim deed); Ex. 90 (Polk County Property Record Card, Sales Information, Item 1); Ex. 16 (Springer-Charles Declaration, Exhibit 1).

[174]Ex. 30 (Vizzi Dec.) ¶ 29b; Ex 93 (Massachusetts Quitclaim Deed, 9/10/2014).

### iv.     Auto-Related Expenditures

In May 2012, Zhong used $55,000 of EB-5 Investments funds towards the purchase in her name of BMW X5 automobile that Zhong gave to her daughter as a gift.[175]   In August 2013, Zhong used $98,394 of EB-5 Investments funds to be used towards the purchase in her name of a Mercedes automobile.[176]

### v.     Educational Expenses

Between September 2012 and August 2014, Zhong caused USI to spend $59,346 on various items related to tutoring services, college applications, and private school tuition for the benefit of the children of her brother and the children of a business partner.[177]

### vi.     Legal Expenses

Between December 2012 and October 2014, Zhong caused EB-5 Investments to pay legal fees of $13,520 for personal estate planning legal expenses.[178]

### vii.     Trading Account

In March 2014, Zhong transferred $10,000 from USI to an account in her name at Vanguard Group.[179]

### viii.     Miscellaneous Personal Expenses

Between November 2011 and October 2014, Zhong used approximately $34,760 of EB-5 Investments funds for expenses that have no legitimate business purpose, such as a Carnival

---

[175] Ex. 30 (Vizzi Dec.) ¶¶ 8, 30(a).

[176] *Id.* at ¶ 30(b); Ex. 77 (list of assets, investigation Ex 22); Ex. 2 (Zhong testimony) 395:8-13, 397:1-8, 398:7-10, 399:3-400:1, 400:5-401:1.15, Ex. 15 (Mentor testimony) 283:13-284:14; Ex. 94 (documents from Braman Management); Ex. 96 (documents from Mercedes of Ft. Pierce).

[177] Ex. 30 (Vizzi Dec.) ¶ 32; Ex. 2 (Zhong Testimony), at 516:17-519:13; Ex. 15 (Mentor Testimony), at 33:17-18, 40:14-41:2.

[178] Ex. 30 (Vizzi Dec.) ¶ 34; Ex. 95 (Thomas Silverman records).

[179] Ex. 30 (Vizzi Dec.) ¶ 36.

cruise, personal real estate taxes, homeowner association fees, health and other personal care expenses, and pet care expenses.[180]

### b.   *Use of Investor Funds for Non-Authorized Purposes*

The following transactions, while not necessarily involving a flow of funds directly into Zhong's pocket, nevertheless involved a use of EB-5 Investments' money for purposes other than construction projects and were related-party transactions undertaken without the approval of investors.

### i.   **Zhong's Misappropriation of Proceeds to Fund Her Company, Relief Defendant Top Sun**

As set forth above, on December 1, 2011, Zhong formed Top Sun, a solar energy business, and obtained a 55% ownership interest.[181]  On December 18, 2011, Zhong caused EB-5 Investments to purchase her 55% interest in Top Sun for $66,000.[182]  Subsequently, from February 2013 to June 2014, Zhong transferred approximately $15,000 from EB-5 Investments and B.X Wok to Top Sun.[183]

### ii.   **Purchase and Upkeep of Boat**

In January 2013, the Zhong-controlled entity B.X Property purchased a boat—a 1999 Sea Ray—for a total cost of $175,495.[184]  USI provided $16,800 of the purchase price,[185] and the remaining $158,695 came from B.X Property, whose account Zhong opened the day before and

---

[180] Ex. 30, at ¶ 37.

[181] Ex. 28 (testimony Exhibit 48), at 4-11.

[182] Ex. 29 (testimony Exhibit 35); Ex. 2 (Zhong Testimony) 506:8-507:1; Ex. 30 (Vizzi Dec.) ¶¶ 27(a), 27(b).

[183] Ex. 30 (Vizzi Dec.) ¶ 27(c)&(d).

[184] Ex. 36. (Bay Shore Marine Record); Ex. 37 (Ocean Blue Yacht Records), at 3; *see supra* note 6 (showing Zhong's control of B.X property).

[185] Ex. 30, ¶ 24(a); Ex. 37 (Ocean Blue Yacht records), at 23.

then funded with B.X Wok deposits; ultimately, EB-5 Investments deposits.[186]   After the boat

purchase, during 2013 and 2014, USI spent more than $35,000 on what appear to be boat related

expenses.[187]

### iii.   Purchase of Home Used by Zhong as Residence

As discussed in more detail below, between November 2012 and April 2013, Defendants

moved approximately $6.5 million of investor funds out of investors' escrow accounts[188] without

their consent.  Of that amount, $5 million dollars of EB-5 Investment funds was transferred into

a Merrill Lynch account as collateral toward the purchase of a home.[189]   In November 2012,

Zhong caused EB-5 Investments to provide approximately $2,500,000 toward the purchase by

Ocean LP of the residence located at 2624 South Ocean Boulevard, Highland Beach Florida.[190]

Shortly thereafter, EB-5 Investments obtained for a nominal amount Zhong and her daughter's

99% interest in Ocean LP, [191] with Zhong retaining a 1% interest.[192]   During the course of Ocean

LP's ownership of the residence, Zhong caused approximately $250,000 of EB-5 Investments

funds to be used for purported improvements on the Highland Beach residence.[194]  On March 5,

---

[186]Ex. 37 (Ocean Blue Yacht Records), at 3, 24; Ex. 30 (Vizzi Dec.) ¶ 20(a), 22, 24(b); Ex. 2 (Zhong Testimony) at 392:8-19.

[187]Ex. 30 (Vizzi Dec) ¶ 25 (payees were Bay Shore Marine Engine ($6,300), Ocean Blue Yacht Sales ($6,159), and Yacht Management S. Florida ($29,470)); Ex. 76. (Bay Shore Marine Invoice).

[188]Ex. 30 at ¶ 7, n.9.

[189] Ex. 30 at ¶ 40; Ex. 2 at pp. 419:16-425:2.

[190]Ex. 30 (Vizzi Dec) ¶¶ 39-40; Ex. 32 (Palm Beach County Property Appraiser Record); Ex. 33 (Trustee's Deed, 11/14/2012); Ex. 2 (Zhong Testimony), at 420:13-15.

[191]Ex. 79 (Corporate Documents for Ocean Blvd Family Limited Partnership and Ocean Blvd. Property Management LLC, Testimony Ex. 54); Ex. 15 at 208:7-12.

[192] Ex. 2 at p. 425:3-425:22.

[194] *Id.* at 429:1-430:7.

2015, after Zhong became aware of the Commission's investigation,[195] Zhong caused Ocean LP to transfer the property by Quit Claim Deed to EB-5 Investments.[196]   Zhong has used this property as a residence and continued to do so (with her daughter) as of August 2015.[197]

### 6.  Misrepresentations and Omissions

#### a.  *Regarding the use of EB-5 Investments' Funds*

Between March 2011 and August 2014, Zhong, directly and through EB-5 Investments, misrepresented the use of EB-5 Investments funds in the PPMs and Operating Agreements.  For example, as set forth above, EB-5 Investments' PPMs stated it was in the business of making loans or equity investments in companies for use in real estate projects.  In truth, Defendants misused and misappropriated EB-5 Investments' funds on undisclosed and personal expenses.

#### b.  *Omissions Regarding Zhong's Background*

Between March 2011 and September 2014, Zhong and EB-5 Investments failed to disclose to investors that Zhong was the subject of personal bankruptcy proceedings and  a failed real estate development business.  Instead, in the PPMs, EB-5 Investments and Zhong touted Zhong's experience as a reason to invest in EB-5 despite EB-5's unproven track record, stating, "Though [EB-5] is newly organized and has no operating history upon which investors may evaluate its performance, the Manager [Asset Manager], its officers [Zhong] and affiliates, and the model on which the Company has been structured, all evidence an extensive history and track

---

[195]Ex. 16, Ex. B (email exchange between Lilly Zhong and SEC staff attorney).

[196]Ex. 34 (Quit Claim Deed).

[197]Exh. 2 (Zhong Testimony), at 34:2-35:24; Ex. 35 (Zhong Test), at 759:14-21.

record...."[198] Unbeknonwst to investors, that track record included personal and corporate bankruptcies and failed real estate development deals.

Additionally, Zhong met with potential investors and cited her background in real estate as a reason to invest. For example, prior to investor Zhang investing in EB-5 Investments, Zhong told him she had worked for a real estate company and then had owned her own real estate company.[199] Similarly, Zhong told investor Xu she had been in the real estate development and investment business for years and had previously lived in New Zealand, where she did not conduct business.[200] However, Defendants failed to tell investors that part of Zhong's history and track record included being the subject of a bankruptcy proceeding in 2008.[201]

Nor did Defendants disclose Zhongs' role as an officer, director, owner, and guarantor of Winsun Developments Limited, a New Zealand real estate development company which was declared bankrupt in Auckland, New Zealand in or about 2008.[202] When asked whether investors in EB-5 Investments, a real estate development venture, might have wanted to know the full story about this history, Zhong replied, "I don't think so."[203]

### c. *False Statements Regarding Annual Financial Reports*

Between March 2011 and August 2014, EB-5 Investments falsely claimed in its PPMs and in each version of the corresponding operating agreement that it would prepare or provide investors with annual unaudited financial reports. For example, in each version of the PPM, EB-

---

[198]Ex. 20 at p. 12; Ex. 54 at p.11; Ex. 40 at p.11.

[199]Ex. 66.

[200]Ex. 67.

[201]Ex. 17.

[202]*Id.;* Ex. 2 at pp. 310:4-313:4; Ex. 21 at p.17.

[203] Ex. 2 at pp. 312:16-318:17.

5 Investments stated it would "provide each Member [investor] with unaudited annual financial reports with respect to the operations of the Company."[204]   However, EB-5 Investments neither prepared nor provided unaudited financial reports to investors.[205]

The lack of unaudited financials enabled EB-5 Investments and Zhong to conceal from investors the misuse of their investment funds and the performance of their investment.

### d.   *False Statements Regarding Escrow Requirements*

Between March 2011 and at least May 2014, EB-5 Investments falsely claimed in its PPM, escrow agreement, and business plan that investor funds would be held in escrow pending USCIS approval of their I-526 petitions.[206]   EB-5 Investments' First PPM and Second PPM stated it would hold investors' funds in escrow "until such time as such investor's I-526 Petition has been approved by the [USCIS]."[207]   EB-5 Investments also provided investors with an escrow agreement stating that "[n]o amount of the Subscriber's capital contribution of $500,000 shall be released into the job-creating entity until approval of the I-526…."[208]

However, between November 8, 2012 and at least April 25, 2013, Zhong and EB-5 Investments moved approximately $6.5 million of investor funds out of investors' escrow accounts[209] before USCIS had approved their I-526 petitions.[210]   This conduct was not only in violation of the escrow agreements, but also contrary to the representations in EB-5 Investments'

---

[204]Ex. 20 at p.14; Ex. 54 at p.13; Ex. 40 at p.13.

[205]Ex. 2 at 476-91.

[206]Ex. 20 at pp.2, 6-7, 18; Ex. 63.

[207]Ex. 20 at pp.6-7.

[208]Ex. 63.

[209]Ex. 30 at ¶ 7, n.9.

[210]Ex. 2 at 364-65.

PPM and business plan that investors' funds would remain in escrow until USCIS petitions were approved.

Zhong transferred these investor funds from the escrow accounts to EB-5 and USI accounts she controlled.  Specifically, Zhong transferred funds from investor escrow accounts as follows:[211]

| U.S. EB-5 Investments LLC Investor Account | Date Funds Transferred | Account Funds Transferred To | Approximate Amount Transferred |
|---|---|---|---|
| Yao Liu Account 0655 | 11/8/2012 | EB-5 Investments Operating Account | $500,000 |
| Hongmei Han Account 0913 | 11/5/2012 | USI Account 9338 | $600,000 |
| Hongmei Han Account 0913 | 11/8/2012 | EB-5 Investments Operating Account | $400,000 |
| Rong Pan Account 0984 | 11/1/2012 | EB-5 Investments Operating Account | $500,000 |
| Oiang Zhang Account 1006 | 11/5/2012 | USI Account 9338 | $500,000 |
| Zhuanghua Chen Account 1133 | 2/20/2013 | EB-5 Investments Operating Account | $500,000 |
| Yaodong Zhan Account 1159 | 4/25/2013 | EB-5 Investments Operating Account | $500,000 |
| Hequn Zhang Account 2948 | 11/8/2012 | EB-5 Investments Operating Account | $500,000 |
| Jin Zhu Ye Account 2951 | 11/28/2012 | EB-5 Investments Operating Account | $500,000 |
| Peizhi He Account 3183 | 11/8/2012 | EB-5 Investments Operating Account | $500,000 |
| Yiyi Zhu Account 3235 | 11/1/2012 | EB-5 Investments Operating Account | $500,000 |
| Hongdong Chen Account 3329 | 11/27/2012 | EB-5 Investments Operating Account | $500,000 |
| Sun Jian Account 7165 | 11/5/2012 | USI Account 9338 | $500,000 |
| Long Cui Account 8648 | 11/8/2012 | EB-5 Investments Operating Account | $500,000 |
| Shushu Liu Account 8716 | 11/1/2012 | EB-5 Investments Operating Account | $500,000 |
| **Approximate Total From Investor Accounts** | | | **$7,500,000** |

On November 5, 2012 and February 2013, Zhong transferred $500,000 of funds from the EB-5 Investments account into the 0913 Hongmei Han account, and on February 22, 2013, Zhong transferred $500,000 back into the 066 Yao Liu account.[212]  Therefore, the amount Zhong

[211]Ex. 30 at ¶ **7.**

[212]*Id.* at ¶ 7, n. 8.

depleted the escrow funds was $6.5 million.[213]   Despite what the bank records reveal, Zhong continues to deny investors' funds were transferred from the escrow accounts prior to the visa approvals.[214]

After improperly removing investors' funds from the escrow accounts, EB-5 Investments and Zhong made efforts to conceal their misuse of investor funds by asking investors to sign a consent form ("Consent") stating the investor consented to the release of funds from the escrow account.[215]

However, the Consent failed to advise investors that the investors' funds had already been released from escrow.   For example, as set forth in the chart above, Zhong transferred Shushu Liu's funds from the escrow account on November 1, 2012.   Liu's Consent to the removal of his funds from escrow is dated August 8, 2013.[216]   Similarly, as set forth in the above chart, Zhong transferred Yaodong Zhan's funds from escrow on April 25, 2013.   Zhan's Consent is dated four months later, on August 22, 2013.[217]

### e.   *Misrepresentations Regarding Conflicts of Interest*

In its PPMs, EB-5 Investments stated, "[c]ertain conflicts of interest exist and might in the future exist between the Company and the Manager and its affiliates and agents" and that the "[m]anager may cause the Company to do business with the Manager's affiliates."[218]   However,

---

[213]*Id.* at ¶ 7, n. 9.

[214]Ex. 2 at 361:75.

[215]Ex. 78 (Consent Forms, Testimony Ex. 31); Ex. 2 at 366:25-367:9, 369:18-24.

[216]Ex. 78 at p.5.

[217]*Id.* at p.7.

[218]Ex. 20 at p.9; Ex. 54 at p.8; Ex. 40 at pp.8-9.

the operating agreements all provided that transactions of this type would require investor consent:

> The Company may enter into arrangements, contracts, or agreements which benefit the Members, their Family or Affiliates with the consent of the other Members provided, that the consent of the other Members shall not be unreasonably withheld if there has been full disclosure by said Members as to the benefits to be received by him (or his Family or Affiliates)....[219]

As explained more fully in Section 5 above, despite these representations to investors, Defendants routinely entered into arrangements, contracts, or agreements without full disclosure of the conflicts they presented, the benefits they imparted to Zhong, her family members or affiliates, and without consent of the investors:

- **Ocean LP Purchase Agreement:** Zhong's use of $2.5 million of EB-5 Investments funds[220] in November 2012 to purchase a waterfront home in Highland Beach, Florida, in the name of Ocean LP,[221] at a time when Zhong had an interest in and controlled Ocean LP,[222] and where, as of at least late August 2015, Zhong continues to reside with her daughter.[223]

- **Top Sun Purchase Agreement:** Zhong's use of EB-5 Investments funds in December 2011 to purchase Zhong's 55% ownership in Relief Defendant Top Sun for approximately $66,000.[224]

---

[219]Ex. 20 at p. 49; Ex. 54 at p. 48; Ex. 40 at p.49.

[220]Ex. 30 at ¶¶ 39-40.

[221]Ex. 33 (Palm Beach County Trustee Deed); Ex. 32 (Palm Beach County Property Appraiser Record)

[222]Ex. 79 (Corporate Documents for Ocean Blvd Family Limited Partnership and Ocean Blvd. Property Management LLC, Testimony Ex. 54); Ex. 15 at 208:7-12.

[223]Ex. 35 at 759:14-21.

[224]Ex. 29.

- **USI Purchase and Profit Distribution Agreements**: Zhong's sale of her family's interest in USI to EB-5 Investments in two transactions which resulted in her purportedly receiving 50% of USI's profits notwithstanding her ownership of only 1% ownership.[225]

- **Oakland Holdings Lease Agreement**: Zhong's use of EB-5 Investments funds to purchase and make mortgage and other payments for a condominium in the name of Oakland Holdings, a company she co-owned with Mentor.

- **Purported Loans to Asset Manager and Zhong**:  Zhong use of EB-5 Investments funds to fund personal expenditures, which she characterized during her testimony as personal loans,  even though all versions of EB-5 Investments' PPM prohibit Asset Manager and Zhong from entering into arrangements which benefit Asset Manager or Zhong absent disclosure to and the consent of investors.

### f. *False Statements Regarding Location of EB-5 Investments' Projects*

Between March 2011 and September 2014, EB-5 Investments falsely claimed in its PPMs, in each version of the corresponding operating agreement, and in its business plan that EB-5 Investments' projects would be located in Florida.[226]  For example, EB-5 Investments PPMs stated that it "will invest in multiple projects in TEA's in Florida" and that "[a]ll projects will be located in the state of Florida."[227]  Contrary to these statements, in or about September

---

[225]Ex. 26 (USI Purchase Agreement, Testimony Ex. 10); Ex. 80 (Profit Sharing Agreement, Testimony Ex. 12); Ex. 2 (Zhong Test.) at 135:17-136:18, 138:15-136:18, 148:9-149:7.

[226]Ex. 20 at 7,8,18,48; Ex. 54 at 6-7,16,47; Ex. 40 at 6-7,17,48.

[227]Ex. 20 at 7-8.

2014, Zhong used approximately $79,000 of EB-5 Investments funds to purchase a home in Worcester, Massachusetts[228] titled in Zhong's name.[229]

### g. *False Statements Regarding Investors' Active Involvement in EB-5 Program*

A petition submitted to USCIS under the EB-5 Program must be accompanied by evidence that the immigrant investor "is or will be engaged in the management of the new commercial enterprise, either through the exercise of day-to-day managerial control or through policy formulation, as opposed to maintaining a purely passive role in regard to the investment."[230] In order to purportedly comply with this requirement, EB-5 Investments' Offering Materials repeatedly represented to investors that "Members [would] be permitted, as a group, to participate and vote on policy decisions, in an advisory capacity only, affecting the business of the Company *at an annual meeting of all Members, in order to satisfy the 'active involvement' requirement of EB-5*" (emphasis added).[231] Moreover, EB-5 Investments, through Mentor, submitted the same Offering Materials to USCIS in order make it appear they were in compliance.[232]  But EB-5 held no such meetings.[233]

### 7. **Defendants' Continued Misuse and Dissipation of Funds and Assets**

On August 26, 2015, after becoming aware of the Commission's investigation in this matter, Zhong and Asset Manager retained John Heller, CPA of Marcum LLP to act as a

---

[228]Ex. 2 at 402:24-403:13.

[229]Ex. 82 (Massachusetts Property Record)

[230] 8 C.F.R. § 204.6(j)(5) (2011).

[231] Ex. 53, at p.11.

[232] Ex. 15 at 164:16-22; Ex. 67 (Xu Declaration) at ¶¶ 18-20.

[233] Ex. 2 at 458:20-459:5.

"Servicing Agent."  Heller and Marcum LLP are not independent and are currently retained by Zhong and Asset Manager to do certain tax compliance and other work.

On about August 26, 2015, Zhong transferred to Relief Defendant Investor Asset a security interest in and to all real property EB-5 Investments owns, as well the three vehicles and boat purchased with EB-5 Investments funds.[234]  The agreement between Zhong and Investor Asset does not remove Zhong's control of the remaining investor funds and remains the signatory on the corporate Defendants' and Relief Defendants' accounts.[235]  The agreement makes no provision for collecting rent payments from the EB-5 rental properties.[236]  As currently structured, the agreement does not include all properties purchased with EB-Investments funds.[237]  Therefore, control of these properties remains solely with Zhong and EB-5 Investments.

The improper profit-sharing agreement set forth in Section III(D)(5)(a)(i) above, giving Zhong 50 percent of the profits from the sale of any USI-owned property, remains in effect. Further, Zhong is currently in the process of encumbering the real property purchased using EB-5 Investments funds, and has outstanding loan petitions to refinance these properties.[238]

On September 14, 2015, Defendants sent investors a Third Amendment to the PPM, offering them the opportunity to settle or recommit to their investments.[239]  Assets are disappearing.  In May 2015, when Zhong initially testified in this matter, EB-5 Investments and

---

[234]Ex. 16.

[235]Ex. 35 at 729:7-731:1.

[236]*Id.* at 779:7-781:2.

[237]*Id.* at 722:20-723:7, 740:23-754:22; Ex. 50 (Testimony Ex. 100); Ex. 83 (Testimony Ex. 101); Ex. 84 (Testimony Ex. 102); Ex. 85 (Testimony Ex. 103).

[238]Ex. 35 at 693:5-20, 779:18-781:2.

[239]Ex. 16.

its subsidiaries had about $1 million in their accounts, but by her second testimony in August 2015, the companies had only about $20,000 in the accounts.[240]

## IV.   AN ASSET FREEZE IS APPROPRIATE

### A. Standard for Asset Freeze

The Court may order an asset freeze "as a means of preserving funds for the equitable remedy of disgorgement."[241] "The SEC's burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light:  a reasonable approximation of a defendant's ill-gotten gains is required.  Exactitude is not . . . ."[242] The Commission's burden to demonstrate the potential for dissipation of funds is even lighter.[243]

The Court's power to freeze assets extends to relief defendants.[244] A relief defendant is a party not charged with wrongdoing who nevertheless "possesses illegally obtained profits but has no legitimate claim to them."[245] To obtain a freeze of a relief defendant's assets, the Commission "must demonstrate only that [it] is likely ultimately to succeed in disgorging the frozen funds."[246]

---

[240]Ex. 35 at 731:7-23; 685:14-23.

[241]*SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005); *accord CFTC v. Levy*, 541 F.3d 1102, 1114 (11th Cir. 2008).

[242]*ETS Payphones*, 408 F.3d at 735 (citation, quotation, and alteration omitted); *accord FTC v. IAB Marketing Associates, LP.*, 746 F.3d 1228, 1234 (11th Cir. 2014).

[243]*See FTC v. IAB Marketing Associates, LP v. IAB Marketing Associates, LP*, 972 F. Supp. 2d 1307, 1313 n.3 (S.D. Fla. 2013) ("There does not need to be evidence that assets will likely be dissipated in order to impose an asset freeze.") (citing *ETS Payphones*, 408 F.3d at 734, and *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1367, 1370 (S.D. Fla. 2006)); *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) ("[T]he SEC must demonstrate only . . . a concern that defendants will dissipate their assets . . . .").

[244]*See CFTC v. Walsh*, 618 F.3d 218, 225 (2d Cir. 2010); *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998); *CFTC v. International Berkshire Group Holdings, Inc.*, 2006 WL 3716390, *10 (S.D. Fla. Nov. 3, 2006).

[245]*SEC v. Huff*, 758 F. Supp. 2d 1288, 1362 (S.D. Fla. 2010) (Rosenbaum, M.J.), *aff'd on other grounds*, 455 F. App'x 882 (11th Cir. 2012) (unpublished).

[246]*Walsh*, 618 F.3d at 225.

**B.** **The Commission Has Established _Prima Facie_ Violations Of The Securities Laws**

The Commission has met its burden of establishing a _prima facie_ showing of violations of the securities laws as alleged in the Complaint.

### 1. The Membership Interests are Securities

The EB-5 Investments offering materials identify the membership interests as securities.[247] Their own characterization of these investments as subject to the federal securities laws is sufficient to characterize them as securities where, as here, there are "no countervailing factors that would [lead] a reasonable person to question this characterization."[248]

Even if the Defendants had not admitted the membership interests are securities, the membership interests are investment contracts and therefore securities covered under the federal securities laws. Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other things, "investment contracts." Although the term "investment contract" is not defined in these statutes, the Supreme Court has defined the term to mean: (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived solely from the efforts of others.[249] The Court has stressed that the definition of an investment contract "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."[250]

---

[247]Ex. 16.

[248]_Diaz Vicente v. Obenauer_, 736 F. Supp. 679, 693 (E.D. Va. 1990) (quoting _Reves v. Ernst & Young_, 494 U.S. 56, 68 (1990)).

[249]_See SEC v. W.J. Howey Co._, 328 U.S. 293, 298-99 (1946).

[250]_Id._ at 299.

The first *Howey* factor is easily satisfied, as the undisputed facts show investors in EB-5 Investments provided an investment of money.[251] "All that is required is that the investor give up some tangible and definable consideration."[252] The Private Placement Memo identifies this as an investment,[253] and Defendants admit 17 people invested approximately $8.5 million.[254]

Second, the undisputed facts show the relationship between EB-5 Investments and its investors constitutes a "common enterprise." The Eleventh Circuit has held that "broad vertical commonality" is sufficient to satisfy *Howey*'s common enterprise element.[255] Broad vertical commonality requires only a finding that investors' fortunes are linked to the efforts of the promoter or third parties.[256] Here, investors' potential for profits depended on the efforts of EB-5 Investments and Defendants Asset Manager and Zhong to develop real estate.

Third, the investors were led to expect profits from EB-5 Investments and Defendants, and therefore the third prong of *Howey* is satisfied. Since *Howey*, the law has been clarified that profits need not be derived *solely* from the efforts of others. Instead, the inquiry is "whether the efforts made by others are *the undeniably significant ones*, those essential managerial efforts which affect the failure or success of the enterprise."[257]

---

[251]Ex. 16.

[252]*SEC v. Unique Financial Concepts, Inc.,* 119 F. Supp. 2d 1332, 1337 (S.D. Fla. 1998), *aff'd*, 196 F.3d 1195 (11th Cir. 1999).

[253]Ex. 20 at 24; Ex. 54; Ex. 40.

[254]Ex. 16.

[255]*SEC v. Unique Financial Concepts, Inc.,* 119 F. Supp. 2d 1332, 1337 (S.D. Fla. 1998), *aff'd*, 196 F.3d 1195, 1199-1200 (11th Cir. 1999).

[256]*Id. See also SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 732 (11th Cir. 2005); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478-479 (5th Cir. 1974); *SEC v. Continental Commodities Corp.*, 497 F.2d 516, 520- 523 (5th Cir. 1974).

[257]*Unique Financial*, 196 F.3d at 1201 (internal citations and quotation omitted); *see also United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 (1975) (clarifying the third prong of the *Howey* test, *footnote continued*

In the Eleventh Circuit, whether the investment satisfies *Howey*'s third prong is determined by "the amount of control that the investors retain[ed over their investment] under their written agreements," as well as the actual ability of the investors to manage their investments.[258]   Here, EB-5 Investments and Defendants had exclusive control over how the investors' funds were used – the investors had no control over which properties were developed or purchased, or how Defendants spent their investments. Although EB-5 Investments' offering documents state investors have the right to initially vote and then simply have input on policy decisions at annual meetings, these meetings never occurred.   Further, even with a vote, Asset Manager always held the majority of all outstanding membership interests, giving it complete control over EB-5 Investments and its limitation on investor input as "advisory."[259]   The investors' only actual involvement was the investment of money.[260]   Accordingly, the third element of *Howey* is met.

## 2. **Defendants Have Violated the Anti-Fraud Provisions of the Federal Securities Laws**

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit, in connection with the purchase or sale of securities, (a) employing any device, scheme or artifice to defraud; (b) making any material misrepresentation or omission; and (c) engaging in any act, practice or course of business that operates as a fraud or deceit upon any person.   Section 17(a) of the Securities Act prohibits essentially the same type of misconduct in the offer or sale of securities.

---

which is met by demonstrating "a reasonable expectation of profits to be derived from the entrepreneurial or managerial effort of others").

[258] *SEC v. Unique Financial Concepts, Inc.*, 196 F.3d 1195, 1201 (11th Cir. 1999).

[259] Ex. 54, p.11.

[260] Ex. 67 at ¶¶ 10 & 11.

The three main subdivisions of Section 17 and Rule 10b-5 have been considered to be mutually supporting rather than mutually exclusive.[261]

### 1. False Statements and Omissions

To establish a violation for making false statements or omissions in violation of Section 17 of the Securities Act and Section 10(b) of the Exchange Act, the Commission must show: (1) a misrepresentation or omission (2) that is material (3) in the offer of or in connection with the purchase or sale of a security (4) made with scienter (5) in interstate commerce.[262]

Scienter is required for Exchange Act Section 10(b) and Securities Act Section 17(a)(1). Violations of Sections 17(a)(2) and (3) of the Securities Act do not require a finding of scienter and may be established by showing negligence.[263]

### a. The Defendants' Misrepresentations and Omissions

As discussed above, Defendants have made numerous material misrepresentations to investors, including that they would only spend EB-5 Investments funds on particular projects, that they would keep investors' funds in escrow accounts until they had visa approval, that EB-5 Investments would not engage in transactions where it had a conflict of interest, that EB-5 Investments would prepare and provide unaudited financial reports to investors, and that investors would play more than a passive role in the investment.  These claims were patently false. Defendants spent EB-5 Investments funds on numerous projects that had nothing to do with the EB-5 program, including distributing funds for the benefit of Zhong and her family members.

---

[261]*See In the Matter of Flannery and Hopkins*, AP File No. 3-14081, 2014 WL 7145625, *10 (Dec. 15, 2014); *In the Matter of Cady, Roberts & Co.*, 40 S.E.C. 907, 913, 1961 WL 60638, *4 (Nov. 8, 1961);.

[262]*SEC v. Chemical Trust,* 2000 WL 33231600, *9 (S.D. Fla. Dec. 19, 2000); *SEC v. Hasho*, 784 F. Supp. 1059, 1106 (S.D.N.Y. 1992).

[263]*Aaron v. SEC*, 446 U.S. 680, 697 (1980); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453-54 (3rd Cir. 1997).

Defendants moved investors' funds from escrow accounts before even the first visa was approved. Defendants caused EB-5 Investments to engage in transactions with Zhong and her companies, where Zhong, who controlled EB-5 Investments, had a conflict of interest.   EB-5 Investments never distributed financial reports to investors or even began the process of trying to create them.   These were all lies Defendants told investors to lure them into the investment.

On top of that, Defendants touted Zhong's track record and Zhong personally told investors about her background during in-person meetings.   However, Defendants failed to disclose to investors that Zhong's prior company was declared bankrupt and that Zhong herself was the subject of bankruptcy proceedings.

Defendants are liable for these misrepresentations and omissions.   The "maker" of a misstatement is liable under Section 10(b) and Rule 10b-5(b).[264] "The maker" is "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."[265]   Asset Manager, which controlled EB-5 Investments, and Jhong, which controlled Asset Manager, would both be liable for these statements under Rule 10b-5(b).

### b.  <u>The Defendants' Misrepresentations and Omissions are Material</u>

To violate Sections 17(a)(2) and 10(b) and Rule 10b-5(b), the alleged misrepresentations or omitted facts must be material.   Information is material if it would have assumed significance in the investment deliberations of a reasonable investor.[267]   Defendants' misrepresentations about how EB-5 Investments would use funds, Zhong's background, financial information to be prepared for investors, conflicts of interest, maintaining investors' funds in escrow are all

---

[264] *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011).

[265] *Id.*

[267] *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988).

undoubtedly information a reasonable investor would have wanted to know the truth about because they relate directly to the safety and risk of the investment, the use and misuse of funds, and the nature of the business.[268]   And some of the misrepresentations, such as those involving the use of proceeds in accordance with EB-5 Investments' Business Plan and the investor's "active" involvement in the investment, implicated not just the risk of the investments, but the investor's likelihood of obtaining a visa under the EB-5 Program, making them all the more material.

### c. The "In Connection With" Requirement

Because the Defendants made their misrepresentations and omissions as part of their efforts to sell membership interests in EB-5 Investments, their acts meet the "in connection with" requirement of Section 10(b) and Rule 10b-5.[269]

### d. The Defendants are Acting With Scienter

Courts have defined scienter as a state of mind embracing intent to deceive, manipulate or defraud.[270]   The Commission may establish scienter for violations of Sections 17(a)(1) and 10(b) by showing defendants made representations to investors "without basis and in reckless disregard for their truth or falsity."[271]   The Eleventh Circuit has concluded that scienter may be established by a

---

[268] *See In re AIG*, No. 3-11254, 2003 WL 22469910 at *13 (S.D.N.Y. Sept. 11, 2003) ("It is well established that information concerning the financial condition of a company is presumptively material."); *SEC v. North American Research & Development Com.*, 375 F. Supp. 465,470-71 (S.D.N.Y. 1974) (misrepresentations regarding business operations and plans were material), *aff'd*, 511 F.2d 1217 (2d Cir. 1975).

[269] *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (courts should interpret the "in connection with" requirement broadly to effectuate the remedial purpose of the federal securities laws).

[270] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).

[271] *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 10 (D.D.C. 1998).

showing of knowing misconduct or severe recklessness.[272]   As the principal of Asset Manager, Zhong's mental state is imputed to Asset Manager.[273]

The evidence establishes the Defendants acted with a high degree of scienter.   Zhong, who controls Asset Manager, knew her statements to investors orally and in the offering documents were false.   She knew the contents of the offering documents because she reviewed and approved them, and she chose not to disclose her history of bankruptcy.   As detailed above, Zhong, knew or was severely reckless in not knowing that: (1) investor funds would not be and had not been invested as outlined in the offering materials, because she was the one controlling the bank accounts and, therefore, the movement of funds; (2) EB-5 Investments did not prepare and provide unaudited financial reports to investors, because she controlled the companies and knew she had not even hired someone to prepare such reports; (3) investors' funds were not held in escrow until their I-526 petitions received USCIS approval, because Zhong was the individual transferring the funds out of those accounts and then taking steps to conceal the unauthorized transfers; (4) EB-5 Investments routinely entered into agreements that presented a conflict of interest and that benefitted Zhong, her family members, and affiliates without the consent of investors – which she knew because she was the person negotiating and signing those agreements; and, (5) not all of EB-5 Investment's projects were located in Florida, which she knew because she was the individual who purchased the projects and transferred the money to fund the out-of-state investment.

---

[272]*SEC v. Carriba Air*, 681 F.2d 1318, 1324 (11th Cir. 1982).

[273]*See In re Sunbeam Sec. Litig.,* 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999) (the scienter of corporate officers is properly imputed to the corporation); *see also SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

Even after learning about the Commission's investigation in this matter, Zhong chose to disclose only some of the lies she told to lure investors. Specifically, in the September 14, 2015 amendment to the PPM, Zhong disclosed to investors that there was a bankruptcy proceeding concerning her prior company or herself. In this same document, she offered investors the opportunity to recommit to their investments under the PPM – never disclosing or making any effort to disclose the truth about the lies in the PPM. She did not disclose the misuse of funds contrary to the terms of the PPM, nor did she disclose that investors' funds were not kept in escrow, that she never obtained unaudited financial reports, that she disbursed investor proceeds in a manner that did not comply with the EB-5 program, or that she had entered into agreements with herself and her family members in violation of the conflict of interest provisions of the PPM. Instead, she continues hiding the truth from investors for her own gain.

### e. **Interstate Commerce**

The Defendants have indisputably offered and sold their securities in interstate commerce. They have attracted approximately 17 investors in China and the United States, and investors made their investments by wiring funds or delivering checks to EB-5 Investments.[274]

For all the foregoing reasons, the Commission has established a prima facie case that the Defendants have violated and continue to violate the securities laws.

### 2. *Scheme Liability*

In addition to violating the federal securities laws by making a series of misrepresentations and omissions, Defendants have also violated these laws by engaging in a scheme to defraud investors. Courts have described claims under Sections 17(a)(1) and (3) and

---

[274]Ex. 30 at ¶5 footnote 2; *See* 15 U.S.C. §§ 77b(a)(7), 78c(a)(17) ("interstate" defined to include commerce and communications between a state and a foreign country).

10(b) and Rules 10b-5(a) and (c) as "'scheme liability" claims because "they make deceptive conduct actionable."[275]   These provisions allow primary liability to be imposed "not only on persons who made fraudulent misrepresentations, but also on those who had knowledge of the fraud and assisted in its perpetration."[276]   "To be liable for a scheme to defraud, a defendant must have committed a manipulative or deceptive act in furtherance of the scheme."[277]

To persuade investors to invest with Investments LLC, the Defendants knowingly or recklessly engaged in a practice and course of business of making the material misrepresentations, false statements and omissions set out above.  As set forth above, Zhong also obtained certain investors' consent to the release of their funds from their escrow accounts without disclosing that their funds and by extension EB-5 Investments' business operations were not being handled as represented when they invested.  In addition, the Defendants engaged in a practice and course of business of misappropriating EB-5 Investments' funds to pay for Zhong's personal expenses, including, personal property expenses, auto expenses, legal expenses, education expenses for Zhong's family members and business associate, and Zhong's personal trading account.  These fraudulent practices demonstrate that the Defendants were engaged in an overall scheme to defraud.

---

[275]*In re DVI, Inc. Secs. Litig.*, 639 F.3d 623,643 (3d Cir. 2011).

[276]*SEC v. U.S. Envtl. Inc.*, 155 F.3d 107, 112 (2d Cir. 1998).

[277]*SEC v. Fraser*, 2010 U.S. Dist. LEXIS 7038, at *23 (D. Ariz. Jan. 28, 2010); *In SEC v. Zandford*, 535 U.S. 813, 815 (2002) (addressing a fraudulent scheme under Rule 10b-5(a) and a fraudulent course of business under Rule 10b-5(c), and concluding: "Indeed, each time respondent 'exercised his power of disposition (of his customers' securities) for his own benefit,' that conduct, 'without more,' was a fraud."); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152 (1972) (noting that while Rule 10b-5(b) targets false statements or omissions, paragraphs (a) and (c) "are not so restricted").

### C.   Disgorgement is An Appropriate Remedy

"Disgorgement is an equitable remedy intended to prevent unjust enrichment."[278]  As set forth above, Zhong and Asset Manager raised $8.5 million from investors by making misrepresentations and omissions to investors, and also misappropriated approximately $900,000 from EB-5 Investments.

These "reasonable approximation[s] of the defendant[s'] unlawfully acquired assets . . . shift[] [the burden] to the defendants to demonstrate the SEC's estimate is not reasonable." *Id.* Therefore, the Commission has demonstrated a reasonable approximation of the likely disgorgement award against Zhong and Asset Management.

A disgorgement award against Relief Defendants is appropriate if they received illegally obtained funds or assets without a legitimate claim.[279]  A relief defendant—by definition someone *not* accused of wrongdoing—nevertheless lacks a legitimate claim to money or property received.[280]  A contrary conclusion "would allow almost any defendant to circumvent the SEC's power to recapture fraud proceeds, by the simple procedure of giving stock to friends and relatives . . . ."[281]

The Commission need not trace a Defendant's ill-gotten gains to assets currently possessed.[282]  In this case, the Commission has established a likelihood of a disgorgement order

---

[278]*SEC v. Monterosso*, 756 F.3d 1326, 1337 (11th Cir. 2014).

[279] *SEC v. Huff*, 758 F. Supp. 2d 1288, 1361 (S.D. Fla. 2010), *citing SEC v. Cherif*, 933 F.2d 403, 414 n. 11 (7th Cir.1991).

[280]*See CFTC v. Walsh*, 618 F.3d 218, 226 (2d Cir. 2010); *SEC v. George*, 426 F.3d 786, 798 (6th Cir. 2005).

[281]*SEC v. Cavanagh*, 155 F.3d 129, 137 (2d Cir. 1998).

[282]*See FTC v. Leshin*, 719 F.3d 1227, 1234 (11th Cir. 2013) ("[A] disgorgement order establishes a personal liability, which the defendant must satisfy regardless whether he retains the proceeds of his wrongdoing.") (citation and quotation omitted); *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1369 (S.D. Fla. 2006) ("[D]isgorgement is an equitable obligation to return a sum equal to the amount wrongfully *footnote continued*

48

against each Defendant and Relief Defendant by establishing they raised $8.5 million from investors in a fraudulent offering scheme, and misappropriated or misused $900,000 in EB-5 Investments funds.

### D.    A Total Asset Freeze is Appropriate

The equities clearly support an asset freeze as to the Defendants.  Defendants continue to dissipate EB-5 Investments' assets and funds, and Zhong continues to control the bank accounts for EB-5 Investments and the Relief Defendants.  Funds have already been sent overseas,[283] and an asset freeze is necessary to stop the flow of money.  A repatriation order is also necessary to obtain these funds.  A freeze will preserve what remains for disgorgement.

The Court should order a total freeze on the Relief Defendants' assets.  "As between [a relief] defendant[] and the victims of fraud, equity dictates that the rights of the victims should control."[284]  Therefore, when the assets to be frozen are worth less than the likely disgorgement award, a freeze of *all* assets is appropriate.[285]  This is even more important where, as here, Zhong controls the bank accounts for most of the Relief Defendants, and controls the Relief Defendants themselves.

---

obtained, rather than a requirement to replevy a specific asset . . . .") (citation and quotation omitted), *aff'd*, 240 F. App'x 355 (11th Cir. 2007).  This rule applies with equal force to relief defendants.  *See CFTC v. Gresham*, 2012 WL 1606037, *3 (N.D. Ga. May 7, 2012) ("'An individual may be a proper relief defendant even if she does not possess the actual ill-gotten gains if she previously received benefits that were derived from another person's unlawful conduct.'") (quoting *SEC v. Aragon Capital Advisors, LLC*, 2011 WL 3278907, *18 (S.D.N.Y. July 26, 2011)).

[283]Ex. 30 at ¶45.

[284]*SEC v. Antar*, 831 F. Supp. 380, 402-03 (D.N.J. 1993).

[285]*See SEC v. Lauer*, 478 F. App'x 550, 554 (11th Cir. 2012) (unpublished) ("[I]f potential disgorgement is greater than the value of the defendant's assets, the district court can order a full asset freeze."); *ETS Payphones*, 408 F.3d at 735-36 (affirming order that "froze all of [defendant's] assets" when estimated disgorgement and value of frozen assets were comparable; *FTC v. IAB Marketing*, 972 F. Supp. 2d 1307, 1313 (S.D. Fla. 2013) (denying defendants' motion to "unfreeze" funds for living expenses where "Defendants' monetary liability greatly exceeds the frozen funds").

Here a freeze of all of Relief Defendants' assets is appropriate. The likely disgorgement award of $8.5 million far exceeds the value of the EB-5 Investments' accounts (about $20,000 as of late August 2015). Zhong admits she is in the process of refinancing the real estate and further encumbering it. There is also a concern about dissipation of assets, as EB-5 Investments' accounts have dissipated from about $1 million to about $20,000 in the last few months – while Zhong knew about this investigation. Absent a freeze, Zhong would have the opportunity to use the investor and EB-5 Investments funds for living expenses and to defend this litigation. This is not an idle concern: Zhong has used EB-5 Investments' accounts to pay for personal expenditures including cars, homes, trading expenses, legal expenses, and to fund other business ventures. Therefore, the Court should enter an order freezing all of the Defendants' and Relief Defendants' assets pending determination of the Commission's claim for disgorgement.

## V. THE COURT SHOULD ORDER SWORN ACCOUNTINGS, REPATRIATION OF FUNDS, AND EXPEDITED DISCOVERY

The Commission seeks an Order requiring Defendants and Relief Defendants to file with this Court a sworn written accounting. The accounting will document their assets, enabling the Commission to better identify funds subject to disgorgement.[286] This Court may also order the Defendants and Relief Defendants to repatriate assets deposited overseas.[287] Finally, the Court should permit the Commission to commence discovery before the meeting of the parties and to do so on an expedited basis.[288]

---

[286]See SEC v. Lybrand, 2000 WL 913894, *12 (S.D.N.Y. July 6, 2000).

[287]See SEC v. Compania Internacional Financiera, 2011 WL 3251813, *13 (S.D.N.Y. July 29, 2011) ("[A]n order to bring assets to the United States is appropriate if needed to make effective an asset freeze and preserve assets for potential future relief.").

[288]See Fed. R. Civ. P. 26(d)(1) (providing that court may permit discovery to prior to the Rule 26(f) conference); FTC v. IAB Marketing Associates, LP, 2012 WL 4936087, *18-19 (S.D. Fla. Oct. 9, 2012) footnote continued

## VI.  <u>CONCLUSION</u>

For the reasons set forth above, the Commission requests that the Court grant the Commission's Emergency Motion for Asset Freeze and Other Relief and enter the Commission's proposed form of order.

November 4, 2015                                         Respectfully submitted,

                                    By:    s/ Alejandro O. Soto
                                               Attorney for Plaintiff
                                               **SECURITIES AND EXCHANGE**
                                               **COMMISSION**
                                               801 Brickell Avenue, Suite 1800
                                               Miami, Florida 33131
                                               Telephone: (305) 982-6313
                                               Facsimile: (305) 536-4154

---

(permitting expedited discovery); *CFTC v. Chandler*, 2012 WL 5382903, *3-4 (M.D. Fla. Sept. 11, 2012) (same).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 15-cv-62323-JAL

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

U.S. EB-5 INVESTMENTS LLC,
EB5 ASSET MANAGER, LLC, and
LIN ZHONG A/K/A LILY ZHONG

Defendants, and

OAKLAND OFFICE HOLDINGS LLC,
B.X WOK CONSTRUCTION LLC,
US INVESTMENT LLC D/B/A US INVESTMENT FL LLC,
TOP SUN ENERGY LLC,
OCEAN BLVD. FAMILY LIMITED PARTNERSHIP, LTD.,
B.X PROPERTY MANAGEMENT LLC,  and
US1 REAL ESTATE DEVELOPMENTS, LLC,

Relief Defendants.

_____/

**ASSET FREEZE ORDER
AND OTHER EMERGENCY RELIEF**

This cause comes before the Court upon motion by Plaintiff Securities and Exchange
Commission for the following orders with respect to Defendants U.S. EB-5 Investments LLC,
EB5 Asset Manager, LLC, and Lin Zhong a/k/a Lily Zhong (collectively, the "Defendants") and
Relief Defendants Oakland Office Holdings LLC, B.X Wok Construction LLC, US Investment
LLC d/b/a US Investment FL LLC, Top Sun Energy LLC, Ocean Blvd. Family Limited
Partnership, Ltd., B.X Property Management LLC, and US1 Real Estate Developments, LLC:

      1)      an Order Freezing Defendants U.S. EB-5 Investments LLC, EB5 Asset Manager,

             LLC, and Lin Zhong a/k/a Lily Zhong's and Relief Defendant Oakland Office

Holdings LLC, B.X Wok Construction LLC, US Investment LLC d/b/a US Investment FL LLC, Top Sun Energy LLC, Ocean Blvd. Family Limited Partnership, Ltd., B.X Property Management LLC, and US1 Real Estate Developments, LLC's Assets;

2)      an Order Requiring Sworn Accountings;

3)      an Order Prohibiting Destruction of Documents;

4)      an Order Expediting Discovery; and

5)      an Order to Show Cause Why the Court Should Not Issue A Continuing Asset Freeze.

The Court has considered the Commission's Complaint, its Emergency Motion for Asset Freeze and Other Emergency Relief, its Supporting Memorandum of Law, and the declarations and exhibits filed in support of its motion. The Court finds the Commission has made a sufficient and proper showing in support of the relief granted herein by demonstrating a *prima facie* case of securities laws violations by the Defendants and the receipt of illegally obtained funds or assets by Relief Defendants. The Court also finds good cause to believe that unless immediately restrained and enjoined by Order of this Court, the Defendants and Relief Defendants will continue to dissipate, conceal, or transfer from the jurisdiction of this Court assets which could be subject to an Order of Disgorgement. Accordingly:

**IT IS ORDERED AND ADJUDGED** that the motion is **GRANTED**, and the Court also orders as follows:

**I.**

**ASSET FREEZE**

**IT IS FURTHER ORDERED AND ADJUDGED** that:

A.     Defendants U.S. EB-5 Investments LLC, EB5 Asset Manager, LLC, and Lin Zhong a/k/a Lily Zhong, and Relief Defendants Oakland Office Holdings LLC, B.X Wok Construction LLC, US Investment LLC d/b/a US Investment FL LLC, Top Sun Energy LLC, Ocean Blvd. Family Limited Partnership, Ltd., B.X Property Management LLC, and US1 Real Estate Developments, LLC, their directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, who receive notice of this order by personal service, mail, facsimile transmission or otherwise, except any Receiver this Court appoints, be and hereby are, restrained from, directly or indirectly, transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of, or withdrawing any assets or property, including but not limited to cash, free credit balances, fully paid for securities, and, and/or property pledged or hypothecated as collateral for loans, or charging upon or drawing from any lines of credit, owned by, controlled by, or in the possession of:

1. U.S. EB-5 Investments LLC;

2. EB5 Asset Manager, LLC;

3. Lin Zhong a/k/a Lily Zhong;

4. Oakland Office Holdings LLC;

5. B.X Wok Construction LLC;

6. US Investment LLC d/b/a US Investment FL LLC;

7. Top Sun Energy LLC;

8. Ocean Blvd. Family Limited Partnership, Ltd.;

9. B.X Property Management LLC, and;

10. US1 Real Estate Developments, LLC.

B.       Any financial or brokerage institution or other person or entity located within the jurisdiction of the United States Courts and holding any such funds or other assets, in the name, for the benefit or under the control of the U.S. EB-5 Investments LLC, EB5 Asset Manager, LLC, and Lin Zhong a/k/a Lily Zhong, or Oakland Office Holdings LLC, B.X Wok Construction LLC, US Investment LLC d/b/a US Investment FL LLC, Top Sun Energy LLC, Ocean Blvd. Family Limited Partnership, Ltd., B.X Property Management LLC, and US1 Real Estate Developments, LLC, directly or indirectly, held jointly or singly, and which receives actual notice of this order by personal service, facsimile, or otherwise, shall hold and retain within its control and prohibit the withdrawal, removal, transfer, disposition, pledge, encumbrance, assignment, set off, sale, liquidation, dissipation, concealment, or other disposal of any such funds or other assets.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Court has jurisdiction to determine the effect of any bankruptcy proceeding may have on this matter.

**IT IS FURTHER ORDERED AND ADJUDGED** that the automatic stay provisions of 11 U.S.C. § 362(a) do not apply to this matter and the asset freeze requested by the Commission.

## II.

## ACCOUNTINGS

**IT IS FURTHER ORDERED AND ADJUDGED** that within seven calendar days of the issuance of this Order, Defendants U.S. EB-5 Investments LLC, EB5 Asset Manager, LLC, and Lin Zhong a/k/a Lily Zhong, and Relief Defendant Oakland Office Holdings LLC, B.X Wok Construction LLC, US Investment LLC d/b/a US Investment FL LLC, Top Sun Energy LLC, Ocean Blvd. Family Limited Partnership, Ltd., B.X Property Management LLC, and US1 Real Estate Developments, LLC shall:

(a)      make a sworn accounting to this Court and the Commission of all funds, whether in the form of compensation, commissions, loans, income (including payments for assets, shares, or property of any kind), and other benefits (including the provision of services of a personal or mixed business and personal nature) Zhong received from investors, EB-5 Investments LLC, EB5 Asset Manager, LLC, Oakland Office Holdings LLC, B.X Wok Construction LLC, US Investment LLC d/b/a US Investment FL LLC, Top Sun Energy LLC, Ocean Blvd. Family Limited Partnership, Ltd., B.X Property Management LLC, and US1 Real Estate Developments;

(b)      make a sworn accounting to this Court and the Commission of all assets, funds, or other properties held by the Zhong, EB-5 Investments LLC, EB5 Asset Manager, LLC, Oakland Office Holdings LLC, B.X Wok Construction LLC, US Investment LLC d/b/a US Investment FL LLC, Top Sun Energy LLC, Ocean Blvd. Family Limited Partnership, Ltd., B.X Property Management LLC, and US1 Real Estate Developments, jointly or individually, or for its direct or indirect beneficial interest, or over which it maintains control, wherever situated, stating the location, value, and disposition of each such asset, fund, and other property; and

(c)      provide to the Court and the Commission a sworn identification of all accounts (including, but not limited to, bank accounts, savings accounts, securities accounts and deposits of any kind) in which Zhong, EB-5 Investments LLC, EB5 Asset Manager, LLC, Oakland Office Holdings LLC, B.X Wok Construction LLC, US Investment LLC d/b/a US Investment FL LLC, Top Sun Energy LLC, Ocean Blvd. Family Limited Partnership, Ltd., B.X Property Management LLC, and US1 Real Estate Developments (whether solely or jointly), directly or indirectly (including through a corporation, partnership, relative, friend or nominee), either have an interest or over which they have the power or right to exercise control.

**IT IS FURTHER ORDERED AND ADJUDGED** that Defendants U.S. EB-5 Investments LLC, EB5 Asset Manager, LLC, and Lin Zhong a/k/a Lily Zhong, and Relief Defendant Oakland Office Holdings LLC, B.X Wok Construction LLC, US Investment LLC d/b/a US Investment FL LLC, Top Sun Energy LLC, Ocean Blvd. Family Limited Partnership, Ltd., B.X Property Management LLC, and US1 Real Estate Developments, LLC shall each make a sworn accounting within seven calendar days of the issuance of this Order to the Commission and this Court of:

(a)      all funds received from any source, including, but not limited to, funds received from investors;

(b)      all compensation, income (including payment for assets, shares or property of any kind), other benefits (including the provision of services of a personal or mixed business and personal nature) these entities have paid to Zhong; and

(c)      all assets, funds, or other properties held in their names, or for their direct or indirect beneficial interest, or over which they maintain control, wherever situated, stating the location, value, and disposition of each such asset, fund, and other property.

The requirement of the sworn accounting shall not apply to the Court-appointed Receiver over U.S. EB-5 Investments LLC, EB5 Asset Manager, LLC, and Lin Zhong a/k/a Lily Zhong, Oakland Office Holdings LLC, B.X Wok Construction LLC, US Investment LLC d/b/a US Investment FL LLC, Top Sun Energy LLC, Ocean Blvd. Family Limited Partnership, Ltd., B.X Property Management LLC, and US1 Real Estate Developments, LLC.

## III.

## <u>RECORDS PRESERVATION</u>

**IT IS FURTHER ORDERED AND ADJUDGED** that, pending determination of the Commission's request for an Asset Freeze, the Defendants and Relief Defendant, their directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, be and they hereby are restrained and enjoined from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, any of the books, records, documents, correspondence, brochures, manuals, papers, ledgers, accounts, statements, obligations, files and other property of or pertaining to the Defendants and Relief Defendants wherever located, until further Order of this Court.

## IV.

## <u>EXPEDITED DISCOVERY</u>

**IT IS FURTHER ORDERED AND ADJUDGED** that:

(a)     Immediately upon entry of this Order, and while the Commission's request for an Asset Freeze is pending, the parties may take depositions upon oral examination of parties and non-parties subject to two days' notice.  Should any Defendant or Relief Defendant fail to appear for a properly noticed deposition, that party may be prohibited from introducing evidence at the hearing on the Commission's request for a preliminary injunction;

(b)     Immediately upon entry of this Order, and while the Commission's request for an Asset Freeze is pending, the parties shall be entitled to serve interrogatories, requests for the production of documents, and requests for admissions. The parties shall respond to such discovery requests within two days of service;

(c)      All responses to the Commission's discovery requests shall be delivered to Alejandro O. Soto at 801 Brickell Avenue, Suite 1800, Miami, Florida 33131 by the most expeditious means available; and

(d)      Service of discovery requests shall be sufficient if made upon the parties by facsimile or overnight courier, and depositions may be taken by telephone or other remote electronic means.

## SHOW CAUSE HEARING

**IT IS ORDERED AND ADJUDGED** that the Defendants and Relief Defendant show cause, if any, before the Honorable _____ of this Court, at _____ o'clock __.m., on the _____ day of _____, 2015, in Courtroom _____ of the United States Courthouse, _____, Florida, or as soon thereafter as the matter can be heard, why the Court Should Not Enter a Continuing Asset Freeze Order as to Defendants U.S. EB-5 Investments LLC, EB5 Asset Manager, LLC, and Lin Zhong a/k/a Lily Zhong, and Relief Defendant Oakland Office Holdings LLC, B.X Wok Construction LLC, US Investment LLC d/b/a US Investment FL LLC, Top Sun Energy LLC, Ocean Blvd. Family Limited Partnership, Ltd., B.X Property Management LLC, and US1 Real Estate Developments, LLC as requested by the Commission.

## VI.

## RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED AND ADJUDGED** that this Court shall retain jurisdiction over this matter and the Defendants and Relief Defendants in order to implement and carry out the terms of all Orders and Decrees that may be entered and/or to entertain any suitable

application or motion for additional relief within the jurisdiction of this Court, and will order other relief that this Court deems appropriate under the circumstances.

**DONE AND ORDERED** this _____ day of _____, 2015, at <u>Miami,</u> Florida.

_____
JOAN A. LENARD
UNITED STATES DISTRICT JUDGE

Copies to:
Alejandro O. Soto, Esq.
801 Brickell Avenue, Suite 1800
Miami, Florida  33131
*Counsel for Securities and Exchange Commission*
Phone: (305) 982-6313
Fax: (305) 536-4154
SotoAl@sec.gov